**Lulu Nettie FOSTER, Plaintiff,**

v.

**Arthur S. FLEMMING, Secretary of Health, Education, and Welfare, Defendant.**

**Civ. No. 671.**

United States District Court

N. D. Iowa,
Cedar Rapids Division.

Dec. 29, 1960.

Lloyd B. Foster, Chicago, Ill., Allen Heald and W. Howard Smith, Cedar Rapids, Iowa, for plaintiff.

F. E. Van Alstine, U. S. Dist. Atty., and Philip C. Lovrien, Asst. U. S. Dist. Atty., Sioux City, Iowa, for defendant.

GRAVEN, District Judge.

This is an action brought pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.A. § 401 et seq., whereby the plaintiff, after first exhausting all administrative remedies, seeks a review of the final decision of the defendant Secretary of Health, Education and Welfare denying her application for old-age benefits under Title II of that Act, as amended. The defendant has answered, filing a certified copy of the transcript of the record as required by the Act, and has moved for summary judgment. In the review of administrative decisions under the Social Security Act, it is customary for the Secretary of Health, Education and Welfare to move for summary judgment. The courts, in reviewing Social Security Act decisions, are limited to the record before the Referee. Irvin v. Hobby, D.C.N.D.Iowa 1955, 131 F.Supp. 851, 856; Holland v. Altmeyer, D.C.1945, 60 F.Supp. 954, 960. Therefore, the fact that the ruling of the reviewing court is cast in the form of a ruling on a motion for summary judgment is without legal significance.

The plaintiff, a widow, was 78 years of age at the time she applied for old-age insurance benefits in April, 1957. At this time and at the time of the commencement of this action, she resided in the city of Cedar Rapids, Linn County, Iowa. The record indicates that the plaintiff was reared on a farm and that following her marriage at age 23 she and her husband lived on various farms for many years. They began at first as tenants and eventually they acquired a 112-acre farm in Keokuk County, Iowa, near the town of What Cheer, Iowa. Plaintiff's husband died in 1946 and, at the time of the commencement of this action, she was the sole owner of this farm. The pivotal question to be decided upon this review is whether the plaintiff's income from the operation of this farm in the years 1956 and 1957 qualifies as "net earnings from self-employment" within the meaning of Section 211(a) (1) of the Social Security Act, as amended in 1956, 42 U.S.C.A. § 411(a) (1), and the corresponding section of the Internal Revenue Code 1954, 26 U.S.C.A. § 1402.

During 1956 and 1957, the plaintiff lived in Cedar Rapids and leased her farm on a combination crop-share and cash rent basis. She employed a farm management company during this period to perform certain managerial functions on her behalf. In the federal income tax returns which plaintiff filed with the Internal Revenue Service for 1956 and 1957, she listed the income from the farm in question as self-employment income and paid the corresponding self-employment tax thereon. On April 24, 1957, she filed her claim for old-age benefits at the Cedar Rapids, Iowa, district office of the Bureau of Old-Age and Survivors Insurance of the Social Security Administration. That office notified the plaintiff by a letter dated May 29, 1957, that she was not at that time entitled to benefits because her reported quarters of coverage had been reduced to none because of the Bureau's determination that they were all based upon rental income from real estate which is not includable as self-employment income under Section 211(a) (1) of the Act (42 U.S.C.A. § 411(a) (1)) or Section 1402 (a) (1) of the Internal Revenue Code. The letter informed the plaintiff that the District Director of Internal Revenue would be notified and asked to refund to her the tax in question. Plaintiff asked the Bureau to reconsider its determination and when it reaffirmed its position, she sought to have her claim reviewed at a Referee's hearing as she was entitled to do under the applicable regulations. 20 C.F.R. Sec. 403.709. Such a hearing was held and the Referee found that the plaintiff was not entitled to old-age benefits. The plaintiff was

represented by counsel at the hearing. The reasons for the Referee's ruling were fully set forth in an elaborate opinion which will presently be discussed. The plaintiff's request that the Referee's decision be reviewed by the Appeals Council of the Social Security Administration was denied. The decision of the Referee thus becomes the final decision of the Administrator within the meaning of Section 205(g) of the Act (42 U.S.C.A. § 405(g)) providing for review of such final decision. See Goldman v. Folsom, 3 Cir., 1957, 246 F.2d 776, 778; Carqueville v. Folsom, D.C.1958, 170 F. Supp. 777, 779, affirmed sub nom. Carqueville v. Flemming, 7 Cir., 1959, 263 F.2d 875; Irvin v. Hobby, D.C.N.D. Iowa 1955, 131 F.Supp. 851, 856; Norment v. Hobby, D.C.1953, 124 F.Supp. 489, 490.

■■■ The nature and scope of review of such decisions will be first considered. Section 205(g) of the Act (42 U.S.C.A. § 405(g)) provides, in part: "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive, * * *." The plaintiff has the burden of proving that the required conditions of eligibility for benefits have been met. Carqueville v. Flemming, 7 Cir., 1959, 263 F.2d 875, 877; Fuller v. Folsom, D.C.1957, 155 F. Supp. 348, 349; Norment v. Hobby, D.C. 1953, 124 F.Supp. 489, 491. The Social Security Act should be liberally construed in favor of those seeking its benefits, Carroll v. Social Security Board, 7 Cir., 1942, 128 F.2d 876, 881; Carqueville v. Folsom, D.C.1958, 170 F.Supp. 777, 779, affirmed sub nom. Carqueville v. Flemming, 7 Cir., 1959, 263 F.2d 875. However, judicial review of the final decision of the Administrator is circumscribed by statutory and case law.

■■■ The reviewing authority of a district court is limited in that it may not substitute its own factual findings for those of the Referee. Boyd v. Folsom, 3 Cir., 1958, 257 F.2d 778, 781. The present action is not a trial de novo of the plaintiff's claim. Thompson v. Social Security Board, 1946, 81 U.S. App.D.C. 27, 154 F.2d 204; Ayers v. Hobby, D.C.1954, 123 F.Supp. 115, 116; Morgan v. Social Security Board, D.C. 1942, 45 F.Supp. 349, 350. The findings of the Administrator in this case as to any fact, if supported by substantial evidence, are binding upon this Court. 42 U.S.C.A. § 405(g).; Folsom v. O'Neal, 10 Cir., 1957, 250 F.2d 946; Rosewall v. Folsom, 7 Cir., 1957, 239 F.2d 724; Ferenz v. Folsom, 3 Cir., 1956,. 237 F.2d 46, certiorari denied 1957, 352 U.S. 1006, 77 S.Ct. 569, 1 L.Ed.2d 551; Teder v. Hobby, 7 Cir., 1956, 230 F.2d 385; Thompson v. Social Security Board, supra; United States v. LaLone, 9 Cir., 1945, 152 F.2d 43, 44; Social Security Board v. Warren, 8 Cir., 1944, 142 F.2d 974; Carroll v. Social Security Board, supra, 128 F.2d at page 881. The finality accorded to administrative findings of fact also extends to inferences and conclusions drawn by the Administrator if there is a substantial basis for them. Rosewall v. Folsom, supra; Ferenz v. Folsom, supra; Livingstone v. Folsom, 3 Cir., 1956, 234 F.2d 75; Walker v. Altmeyer, 2 Cir., 1943, 137 F.2d 531; Carqueville v. Flemming, supra, 263 F.2d at page 877; Folsom v. O'Neal, supra, 250 F.2d at page 947; United States v. LaLone, supra, 152 F.2d at page 44. See Irvin v. Hobby, D.C.N.D.Iowa 1955, 131 F.Supp. 851, 863.

The Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., also provides for judicial review of the action of administrative agencies. Section 10(e) of that Act (5 U.S.C.A. § 1009) declares:

"So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. It shall * * * (B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; * * * (3) in ex-

cess of statutory jurisdiction, authority, or limitations, or short of statutory right; * * * (5) unsupported by substantial evidence in any case * * * reviewed on the record of an agency hearing provided by statute; * * *. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error."

The provisions of Section 10 of the Administrative Procedure Act have been construed to be in *pari materia* with those of the Social Security Act. See Goldman v. Folsom, 3 Cir., 1957, 246 F.2d 776; Rafal v. Flemming, D.C.1959, 171 F.Supp. 490; Julian v. Folsom, D.C. 1958, 160 F.Supp. 747.

By reason of the provisions of Section 205(g) of the Act as well as the Administrative Procedure Act, it is the duty of this Court to ascertain whether, on the record as a whole, there is substantial evidence to support the Administrator's findings of fact. See Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; O'Leary v. Brown-Pacific-Maxon, Inc., 1951, 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483; Goldman v. Folsom, supra, 246 F.2d at page 778. In discharging that duty, a Court "must take into account whatever in the record fairly detracts from its weight * * *", and "is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. National Labor Relations Board, supra, 340 U.S. at page 488, 71 S.Ct. at page 464.

With respect to questions of law and statutory construction, this Court may determine whether the Referee correctly interpreted the law and applied it to the facts. Henderson v. Flemming, 5 Cir., 1960, 283 F.2d 882; Miller v. Burger, 9 Cir., 1947, 161 F.2d 992; Carroll v. Social Security Board, 7 Cir., 1942, 128 F.2d 876; Rafal v. Flemming, D.C. 1959, 171 F.Supp. 490; Carqueville v. Folsom, D.C.1958, 170 F.Supp. 777, affirmed sub nom. Carqueville v. Flemming, 7 Cir., 1959, 263 F.2d 875; Fuller v. Folsom, D.C.1957, 155 F.Supp. 348; Ayers v. Hobby, D.C.1954, 123 F.Supp. 115; Baiocchi v. Ewing, D.C.1949, 87 F. Supp. 520. If the Referee has incorrectly construed or applied the law, this Court may correct the error. Adams v. Flemming, D.C.1959, 173 F.Supp. 873, 877; Bostick v. Folsom, D.C.1957, 157 F.Supp. 108, 116; Shields v. Folsom, D.C.1957, 153 F.Supp. 733; Patton v. Federal Security Agency, D.C.1946, 69 F.Supp. 282, 286. Although the Referee's conclusions of law are not binding upon this Court, they are entitled to great weight. Social Security Board v. Nierotko, 1946, 327 U.S. 358, 368, 66 S.Ct. 637, 90 L.Ed. 718; Carqueville v. Folsom, supra, 170 F.Supp. at page 780; Fuller v. Folsom, supra, 155 F.Supp. at page 349; Burger v. Social Security Board, D.C.1946, 66 F.Supp. 619, 628.

The function of this Court is to determine whether the factual findings of the Referee are supported by substantial evidence and, if so, whether he properly interpreted and applied the law to the facts. Aubrey v. Folsom, D.C.1957, 151 F.Supp. 836, 837; Ayers v. Hobby, D.C.1954, 123 F.Supp. 115, 116; Hemmerle v. Hobby, D.C.1953, 114 F.Supp. 16, 19; Davis v. Flemming, D.C.1959, 23 F.R.D. 139, 141.

Sections 202(a), 213(a), and 214(a) of the Act (42 U.S.C.A. §§ 402(a), 413 (a), and 414(a)), set forth the requirements for entitlement to Social Security benefits pertinent to the instant case. Under these provisions, a basic condition of eligibility is the receipt over a period of time of a minimum amount of wages or self-employment income. Section 202 (a) provides that an individual shall be entitled to old-age insurance benefits if

he is fully insured, has attained retirement age, and has filed the necessary application. Section 214(a) requires an individual to have a minimum of six quarters of coverage to be fully insured and because the plaintiff was well in advance of retirement age before the coverage of the Act was enlarged so as to include the self-employed, she would qualify as soon as she attained the minimum six quarters of coverage. In regard to quarters occurring after 1950, Section 213(a) provides that a quarter of coverage is achieved for each calendar quarter in which an individual is creditable with earning $50 or more in wages or $100 or more in self-employment income. The ruling in the instant case depends entirely on whether the plaintiff has six quarters of coverage. Upon the facts she has presented, the only possible source from which she could attain six quarters of coverage is the income from the farm previously mentioned. The amount of such income ($1,200 in 1956; $1,083.83 in 1957) is apparently not questioned, and is sufficient to give the plaintiff the requisite number of quarters if it qualifies as "self-employment income."

Self-employment income is defined by Section 211(b) of the Act as "net earnings from self-employment derived by an individual * * * during any taxable year beginning after 1950." The phrase "net earnings from self-employment" is defined in Section 211(a), as amended (42 U.S.C.A. § 411(a)), and the corresponding section of the Internal Revenue Code, 26 U.S.C.A. § 1402(a), as follows:

"The term 'net earnings from self-employment' means the gross income, as computed under [the applicable chapter of the Int.Rev. Code] * * * derived by an individual from any trade or business carried on by such individual, less the deductions allowed under such chapter which are attributable to such trade or business, plus his distributive share (whether or not distributed) of the ordinary net income or loss * * * from any trade or business carried on by a partnership of which he is a member; except that in computing such gross income and deductions and such distributive share of partnership ordinary net income or loss—

"(1) There shall be excluded rentals from real estate and from personal property leased with the real estate (including such rentals paid in crop shares) * * * except that the preceding provisions of this paragraph shall not apply to any income derived by the owner or tenant of land if (A) such income is derived under an arrangement between the owner or tenant and another individual, which provides that such other individual shall produce agricultural . * * * commodities * * * on such land, and that there shall be material participation by the owner or tenant in the production or the management of the production of such * * * commodities, and (B) there is material participation by the owner or tenant with respect to any such * * * commodity."

The greater part of the above provision was inserted in the Act in the Amendments of 1950. Act of Aug. 28, 1950, ch. 809 [adding Sec. 211(a) (1)] 64 Stat. 502. Prior to the 1950 amendments, the Act offered no coverage to the self-employed. At the beginning of this extension of coverage Congress provided that certain types of income were to be excluded in determining an individual's "net earnings from self-employment." Section 211(a) (1) of the Act excluding rental income from real estate has been set forth above. In addition, Section 211(a) (2) excludes income derived from dividends on stock and interest on bonds (unless received in the course of business by a dealer in securities), and Section 211(a) (3) excludes items which partake of the nature of capital gains. The purpose of these provisions appears to be to exclude income which arises from the mere use of one's property by an-

other rather than from actively engaging in a trade or business. In discussing the statute and its exclusion of rentals from real estate, dividends and interest, and items partaking of the nature of capital gains, the Senate Committee on Finance stated in Senate Rep. No. 1669, 81st Cong., 2d Sess. (1950), at page 155 of that report (2 U.S.Code Cong.Service (1950), at pages 3454–3456):

"Special rules for computing the gross income * * * of an individual from a trade or business * * * are set forth in paragraphs (1) to (7), both inclusive, of section 481(a).

"Paragraph (1) excludes rentals from real estate * * * unless such rentals are received in the course of a trade or business as a real estate dealer. * * * A person who merely owns real estate and received rentals therefrom is not considered a real estate dealer. On the other hand, a person who is engaged in the business of selling real estate to customers with a view to the gains and profits that may be derived therefrom is a real estate dealer, and rentals derived by him from such real estate are included for the purpose of determining his net earnings from self-employment.

"Payments for the use or occupancy of entire private residences or living units in duplex or multiple-housing units are generally rentals from real estate. * * * On the other hand, payments for the use or occupancy of rooms or other space where services are also rendered to the occupant * * * do not constitute rentals from real estate. * * *

"Paragraph (3) excludes dividends on any share of stock, and interest on any bond, debenture, note, certificate, or other evidence of indebtedness, issued with interest coupons or in registered form by any corporation * * * unless such dividend and interest are received in the course of a trade or business as a dealer in stocks or securities. * * * Only interest of the specified character is categorically excluded * * *. Other interest received in the course of any trade or business (such as interest received by a pawnbroker on his loans or interest received by a merchant on his accounts or notes receivable) is not excluded * * *.

"Paragraph (4), excludes (1) gains or losses which are considered as gains or losses from the sale or exchange of capital assets * * * The effect of this provision is to exclude from the computation of net earnings from self-employment all gains or losses which are treated as capital gains or losses, as well as gains or losses arising from the disposition or conversion of property which is not considered as either (1) stock in trade * * *, or (2) property held primarily for sale to customers in the ordinary course of a trade or business."

The above quoted Committee report forms the basis for Treasury Regs. Secs. 1.1402(a)—(1) (c) (1), (2), and (3) and for the Old-Age and Survivors Ins. Regs. 20 C.F.R. Secs. 404.1052(a), (c), and (d) which deal generally with the above exclusions without touching upon the "material participation" amendments of 1956.

The above Committee report refers to Section 211(a) as it was originally enacted in 1950. Section 211(a), as heretofore set forth, contains several provisions not found in the statute as originally passed. For a better understanding of this Section of the Act, it seems desirable to present a brief chronological synopsis of how it achieved its current form. It has been mentioned that the 1950 amendments brought self-employed individuals within the coverage of Social Security for the first time. However, in so extending the coverage of the Act, the amendment was drafted so as to expressly exclude the self-employed

farmer. Act of Aug. 28, 1950, ch. 809 [adding Sec. 211(a) (2)] 64 Stat. 502. Four years later the 1954 amendments to the Act (Act of Sept. 1, 1954, ch. 1206, Sec. 101(g) (1), 68 Stat. 1055) removed the clause from Section 211(a) which excluded the self-employed farmer and thus made the Act applicable to such individuals.

The Congress, at this time, apparently entertained some thought as to the status of the farm landlord, for, in the same amendments, it altered the wording of that portion of the Act defining "net earnings from self-employment" so that the exclusion of rentals from real estate already in the Act was expressly made to include "such rentals paid in crop shares." Act of Sept. 1, 1954, ch. 1206, Sec. 101(g) (2), 68 Stat. 1055. By inserting this limitation, the draftsmen treated farm landowners who rented their land in much the same manner as urban landlords. However, there is a distinction here that should be noted. While the usual urban rental scheme is such that the investment capital (land and buildings) produces the return and personal activities play an insignificant role, farm landlords have developed a variety of patterns whereby they share with the tenant the elements of production (land, capital, physical labor, and management) in ways often involving substantial personal contributions to the farming operation by the landowner. Because of this feature, apparently some dissatisfaction was manifested by farm landowners as to the limitation referred to.

In apparent recognition of the fact that under many farm leases the landlord may take an active part in connection with the farm operations, Congress, in 1956, created the concept of "material participation." The 1956 amendments (Act of Aug. 1, 1956, ch. 836, Sec. 104(c) (2), 70 Stat. 824-25) provide that, for any taxable year ending after December 31, 1955, a farm landlord's income from the share-leasing of his farm may be considered as "net earnings from self-employment" if two major tests are met. *First*, such income must be derived under an arrangement between the owner and the tenant which provides that the tenant shall produce agricultural or horticultural commodities on the land and that there shall be material participation by the owner in such production or the management of such production. *Second*, there must in fact be such material participation by the owner. If, and only if, both of these tests are met is the landowner's share treated as self-employment income. This amendment applies to income derived during taxable years ending after 1955. Income received by a landowner under a sharefarming or similar lease arrangement for prior taxable years is considered by the Internal Revenue Service to be rental income from real estate regardless of the degree of participation in the farming operation by the landlord. Rev.Rul. 55-538, 1955-2 CB 313. There has apparently been no judicial review of this administrative determination.

Since the advent of the "material participation" amendments, there have been a multitude of farm owners of near retirement age endeavoring to qualify for old-age benefits by achieving the requisite number of quarters of coverage through income derived from the share-leasing of their farms. The problems of administration in this area spring from the peculiar nature of the share-lease. Under similar labels and provisions, the working arrangements vary from the bare rental of land to operations which might well be regarded as a joint venture. The variety of situations makes it extremely difficult to formulate and apply tests or minimum requirements in determining the existence or absence of "material participation" in the farm operation by the farm landowner. Neither the Social Security Administration nor the Internal Revenue Service has issued any formal regulations pertaining directly to "material participation" under Section 211(a) (1) of the Social Security Act or its counterpart Section 1402(a) (1) of the Internal Revenue Code, as these Acts were amended in 1956. As a

guide for taxpayers and claimants these agencies have issued a number of pamphlets setting forth certain tests for determining whether income received by a landowner from the share-leasing of a farm is to be considered as "net earnings from self-employment." In addition, the Internal Revenue Service has issued a revenue ruling (Rev.Rul. 57–58, 1957–1 CB 270) outlining certain guides. The pamphlets and revenue ruling appear to be based to a large extent upon the report of the Senate Finance Committee pertaining to the bill involved. That report is quite detailed in setting forth the standards which that Committee felt must be met in order to establish "material participation" in a farming operation by a farm landlord. Because litigation in this area is just beginning to reach the Courts, there has been as yet very little judicial interpretation of these amendments.

■ The facts of the instant case involve only the years of 1956 and 1957 at which time the "material participation" amendments were in effect. It is the claim of the plaintiff that the income in question cannot be regarded as rent within the meaning of Section 211(a) (1) (42 U.S.C.A. § 411(a) (1)), even if the 1956 amendments be disregarded, but that in any event there has been a sufficient arrangement for her material participation in the management of production on her farm together with actual material participation on her part to qualify the income received therefrom as self-employment income for Social Security purposes. In connection with the first part of her argument, the plaintiff relies upon the case of Commissioner of Internal Revenue, v. Webster Corp., 2 Cir., 1957, 240 F.2d 164, affirming 1956, 25 T.C. 55. This case raised the question of whether income from a particular share farming arrangement was "rent" for purposes of the personal holding corporation provisions of the Internal Revenue Code. The personal holding corporation surtax is designed to tax the income of corporations which were organized merely to receive and hold income, thus enabling their incorporators to avoid higher tax rates on their personal incomes. The surtax is not levied on corporations which are actively operating companies with more than a passive role in the production of income. The mere collection of rental income is considered to be a passive role in this regard. The situation therefore is at least similar to the problem in the instant case where it is sought to distinguish income which represents a return upon a capital investment from income which is at least in part attributable to physical or managerial services rendered by a landowner. The Webster case raised the question of whether income received by certain Delaware corporations (whose incorporators and officers resided in New York), formed to carry on the operation of several farms in Iowa was rental income subject to the personal holding corporation surtax. The farms were managed as a business venture from New York with the assistance of a farm management company in Omaha, Nebraska. The owners maintained close contact with the situation on the farms and exercised rigid control over the planting, fertilization, and rotation of crops. The farm management company with the consent and direction of the owners leased the farms in question on a crop-share basis to individual farmers who operated the farms as directed. The Tax Court held that the landowners' income did not constitute rent within the meaning of the personal holding corporation provisions. The Court stated (at page 61):

"An owner can receive rent in crops as well as in money, but where the owner who receives a percentage of the crop takes an active part in the operation by reserving and exercising the right of detailed supervision and direction of the operation of the farm, * * * the money which the petitioners received appears to be more in the nature of income from their own use of their own land than rent received by them

'for permitting the farmer to use their land."

It is possible that the principles which prompted the Tax Court and the Court of Appeals for the Second Circuit to reach this result in the Webster case also motivated the Congress in the enactment of the 1956 amendments to the Social Security Act and the Internal Revenue Code. The plaintiff maintains that the Webster case controls her situation quite apart from the "material participation" amendments and that her income can in no sense be categorized as "rentals" excludable from self-employment income. It is the view of the Court that because the Webster case was decided under a different statute from the one here involved, and because Congress has specifically chosen, for the purposes of determining "net earnings from self-employment," to delineate the position of the farm landlord in terms of "material participation," the plaintiff must establish her claim under this provision of the Act.

As evidence of the requisite arrangement for material participation on her behalf, the plaintiff relies upon the provisions of the written farm lease agreement entered into between herself and Mr. and Mrs. L. H. Husband, the tenants on her farm for the years in question. This agreement was entered into on September 22, 1955, to be effective for the period of March 1, 1956, to March 1, 1957. The agreement was renewed by the parties on August 11, 1956, so as to be effective until March 1, 1958. In regard to the actual participation in the management of production on the farm, plaintiff maintains that she satisfied the requirements of the statute by so participating through her agent, the Midland Farm Management Company of Cedar Rapids, Iowa. In addition, she claims that there was personal participation on her part through the consultations she periodically had with the farm management company in regard to management decisions.

Before applying for her benefits, the plaintiff asked for and received the following letter from the Midland Farm Management Company dated March 28, 1957:

"Referring to your visit to the office yesterday, I am returning herewith the circular of the U. S. Department of Health, Education, and Welfare referring to the amendments to the social security law, which you left with me.

"I will give below the work which we do in managing and looking after your farm.

"1. We measure and plat the farm; also measure and describe all buildings for insurance and other purposes.

"2. Interview all applicants for rental and decide which one will be the better farmer for this particular place.

"3. Work out the cropping plans for each year with the tenant and direct where certain crops shall be planted.

"4. Determine whether it is best to comply with the government programs and if so see that the proper contracts with the government are made and carried out by the tenant.

"5. Purchase the proper amount of grass seed and have it delivered and direct where it shall be sowed.

"6. Pay all taxes as they become due; keep all insurance in good standing and in proper amounts.

"7. Test, or have tested, all soils to determine if they are deficient in lime or any other commercial fertilizers and, if so, see that they are properly applied.

"8. After all crops are in plat the farm showing all fields and acreages in the crops growing.

"9. Check all operations frequently during the growing season.

"10. Make plans with the tenant for harvesting and housing all crops at the proper time.

"11. Collect cash rent when due and then dispose of all crops belonging to the owner to the best advantage possible.

"12. The above requires visiting the farm from 8 to 15 times during the year.

"The income from your farm during the past 8 years averages a gross of $1945.00 per year and your net return during the same period has averaged $985.00 per year.

"Assuring you I am glad to give you this information, I am

"Sincerely yours,
"/s/ Ingram Bixler
"President"

A copy of this letter was made available to the Cedar Rapids office of the Bureau of Old-Age and Survivors Insurance before its initial determination on plaintiff's claim.

After the initial determination denying plaintiff's claim and while her request for reconsideration was pending, the Cedar Rapids district office of the Bureau requested certain information from the Midland Farm Management Company as to its dealings with the plaintiff. The following letter was received by that office from Midland dated August 1, 1957:

"Replying to your letter of July 31st, the arrangements we have with Mrs. Foster for managing her farm are covered by the same management agreement as we use on all farms under our supervision. Under that agreement the owners, of course, have full control of their farms but we ask that any suggestions or instructions to the tenant be channeled through our hands. The reason for this, of course, is obvious.

"We present and submit to all owners each year our proposed and recommended cropping. Some of the owners offer suggestions and instructions as to the placing of these crops while other owners leave that matter entirely to our judgment. In this particular case, we have often consulted with Mrs. Foster not only with reference to crops but also as to any improvements which might be recommended or contemplated.

"We hope we have answered your questions but if there is any further information we would be glad to supply it.

"Sincerely yours,
"/s/ Ingram Bixler
"President"

The denial of plaintiff's request for reconsideration was confirmed at the area office level of the Bureau. This result was apparently based on the view of that office that Section 211(a) (1) requires that participation in the management of production must be *personal* participation in order to qualify under the statute and cannot be achieved through the activities of a farm management company hired for that purpose. The management decisions which were in fact made by plaintiff herself were felt by that office to be insignificant. In a letter from that office to the plaintiff dated September 4, 1957, she was informed, in part, as follows:

"Dear Mrs. Foster:

\* \* \* \* \* \*

"The Social Security Act Amendments of 1956 extended coverage to certain farm owners who have entered into farm rental arrangements including share farming arrangements. Under the amendments, rental income from a farm is includable in net earnings from self-employment if the rental arrangements provide that the owner shall materially participate and he does materially participate in the production or in the management of the production of the agricultural commodities on his land. Under the provisions of the Social Security Act only those farm owners who pursuant to agreement either engage to a material degree in the

physical work relating to the farming activities or participate to a material degree in the management decisions of the farm may receive social security coverage.

"The evidence you submitted shows that you did not meet the requirements for material participation in the production of farm commodities in 1956. Your farm was managed for you by the Midland Farm Management Company, Cedar Rapids, Iowa, and under this arrangement you divested yourself of all obligation to personally participate in the production of farm commodities. Under the terms of your contract the Midland Farm Management Company determined the crops to be grown on your land. Although you may have had a voice in determining what crops were to be produced, landlords normally have this right. Your share of the rental income received in 1956 is therefore properly excluded as rental income from real estate.

\* \* \* \* \* \*

"Sincerely yours,
"B. J. Wilson
"'Chief, Area Office"

The Referee who reviewed plaintiff's claim also construed the Act as requiring that material participation must be personal participation and found that plaintiff had, under her contract with the Midland Farm Management Company, relinquished all right on her part to make decisions regarding the operation of her farm. The fact that plaintiff perhaps volunteered suggestions as to the annual crop plan was felt to be inconsequential. In addition, the Referee found that the income in question did not qualify because the lease agreement between the plaintiff and her tenants did not sufficiently provide for material participation on her part in the production or the management of production on her farm.

The contract between the plaintiff and the Midland Farm Management Company, except paragraph Seven thereof relating to compensation, is next set out:

"First. The Owner hereby engages the Company to act as the Manager of the following described real estate:

"South 112.65 acres of the Southwest Quarter of Section 31, Township 77, Range 12 W in Keokuk County, Iowa

and the Company hereby accepts the management of said real estate for the period, upon the terms, and for the compensation as hereinafter set out:

"Second. The Company's management of said real estate shall commence on this date, and shall continue until either party shall give to the other notice in writing of the termination of this agreement. Such notice may be given at any time to be effective upon receipt thereof by the other party in accordance with provisions given below.

"Third. The Company shall have complete and exclusive control of the management of the above described real estate, including authority to: lease said real estate in the name of the Owner; determine the cropping of said real estate; collect the rents therefrom; sell and collect the proceeds of any of the Owner's share or interest in the crops, livestock or farm produce, if any; purchase and arrange for application of lime or fertilizers; select seeds; settle or compromise any claims of the Owner against the tenant and in connection therewith to release tenant from liability for rent where same is deemed advisable by the Company; make expenditures for repairs or improvements to said real estate, provided, however, that repairs or improvements costing in excess of $100 in any one year shall not be undertaken without authority from the Owner.

"Fourth. The Company agrees to prepare and submit to the Owner on

its regular report form a Farm Real Estate Report describing all buildings, fences, topography of the land, kind and character of soils, as well as an outline of the farm designating the different soils; also, a report on the condition of the buildings and an estimate of their insurable value. Also the Company agrees to supply to the Owner a plat of the farm each year after all crops are in the ground, and, within thirty days after January 1 to supply a yearly sheet containing a statement of account showing all receipts and disbursements made by the Company during the preceding year and containing an inventory of all livestock and grain on hand as of the end of said year if the farm is leased on a stock share basis, or, if leased on a crop share and cash rent basis, then it shall contain an inventory of all crops unsold and cash rent uncollected.

"Fifth. The Company will, if requested by the Owner in writing, maintain a record of all insurance policies covering the improvements on the above real estate, and pay such taxes as are reported to the Company by the County Treasurer provided the funds of the Owner held by the Company are sufficient to cover such payments.

"Sixth. The Company agrees to faithfully account to the Owner for all of the net proceeds of the rental collections coming into the hands of the Company under the terms of this contract, and to exercise its best judgment and efforts in the management of the real estate pursuant to the Company's undertakings hereunder, but the Company shall not be liable to the Owner except to faithfully and properly account to the Owner for any sums coming into its hands and except for an act of gross negligence or bad faith in the performance of this contract. If the Company shall advance any of its own funds for the account of the Owner, the Company shall have a lien upon any property of the Owner in its hands (including leases and rents thereunder) to secure any advancements so made and shall have the right to reimburse itself for such advancements out of any funds. of the Owner coming into its possession.

"Eighth. The Owner agrees that the successful management of the real estate requires that all dealings and transactions with the tenant be had with the Company and that, for the protection of the Owner, all dealings and correspondence with the tenant are to be conducted by the Company and any correspondence received by the Owner from the tenant shall be referred to the Company for reply."

It is the view of the Court that, in light of the foregoing contract and the letters from the president of the farm management company relating to the activity performed by it for the plaintiff, very little participation in the management of the production on her farm was carried on personally by the plaintiff during the years in question. This is further borne out by the plaintiff's written statement in her application for old-age benefits where she stated: "I manage the farm. I hire someone to do the managing for me." The finding of the Referee that the plaintiff did not personally participate to a material degree in the management of the production on her farm is supported by substantial evidence and binding on this Court.

The next question argued by the parties was whether "material participation" as used in the 1956 amendments to Section 211(a) (1) of the Act contemplates managerial functions performed, as in the instant case, by a farm management company engaged by the landlord as her agent to make management decisions on her behalf. In making this determination, it is not deemed material whether or not the farm management company be denoted as an "independent contractor" or of some other status.

"Independent contractors" and "agents" are not mutually exclusive terms. Restatement (Second), Agency, Section 2 (3) (1958). "Independent contractors" may be and often are "agents." Distinctions drawn between "independent contractors" and "servants" for purposes of determining vicarious liability in the law of torts has no application here. In the instant case the management company was empowered under the contract to lease the farm in the name of the plaintiff, sell and collect the proceeds of the plaintiff's share of the crops, and to settle or compromise any claims of the plaintiff against the tenants. These powers clearly constitute the management company plaintiff's agent in the leasing and operating of her farm. See Restatement (Second), Agency, Section 2 (1958). While the status of the company as an independent contractor negatives the direction of the company's activities by the plaintiff, and therefore tends to eliminate any claim of personal participation in management on her behalf, this does not affect the determination of whether she can participate vicariously through the activities of the company.

The argument of the defendant is that the statute requires active personal participation and that, therefore, no theory of agency can be used to satisfy its requirements. It is based chiefly on two propositions. First, that the legislative history, i. e., the accompanying committee reports, evidences a clear Congressional intent that personal participation is required. Secondly, it is urged that the underlying purpose of the old-age retirement legislation is to provide a partial replacement for income lost because of the rigors of advanced age, and that, therefore, its benefits should not be made available to those, such as the plaintiff, who stand to lose none of the income from their "managed" farms through the effects of old age.

In support of the first argument just mentioned, the defendant cites a portion of Senate Rep. No. 2133, 84th Cong., 2d Sess. (1956) appearing at page 8 thereof (3 U.S.Code Cong.Service (1956) at page 3884), and a portion of House Rep. No. 1189, 84th Cong., 1st Sess. (1955) appearing at page 10 thereof. The provisions relied upon happen to be identical in each of the above reports and read as follows:

"The bill * * * would extend coverage under old-age and survivors insurance to certain farmers who, though not covered under the present law, *have income from work* and therefore are exposed to the type of income loss against which the program is designed to afford protection." (Emphasis supplied.)

The defendant dwells upon the word "work" in the above Committee reports as connoting personal activity either physical or mental.

The plaintiff urges that the defendant is in error in the determination that income from "work" is the criteria for having one's earnings count toward achieving benefits under the Act. Rather, plaintiff maintains that ever since the 1950 amendments to the Act extended coverage so as to include for the first time the self-employed, the scope of the new coverage was delineated in terms of income "derived by an individual from any trade or business carried on by such individual." In addition, the plaintiff maintains that from its very inception this provision was never intended by Congress to require that the trade or business in question must be carried on by the individual personally. In support of this contention the plaintiff cites the report of the Senate Finance Committee appearing as Senate Rep. No. 1669, 81st Cong., 2d Sess. (1950) (2 U.S.Code Cong. Service (1950) at pages 3452–3453) which contains the following:

"Subsection (a) of section 481 [Sec. 211(a) of the Act] defines the term 'net earnings from self-employment' * * * to mean—

"(1) the gross income derived by an individual from any trade or

business carried on by such individual less [applicable] deductions * * *

* * * * * *

" * * * The trade or business must be 'carried on' by the individual, either personally or through agents or employees, in order for the income to be included in his 'net earnings from self-employment.' "

Plaintiff points out that the foregoing Committee report is the basis for Treas. Reg. Sec. 1.1402(a)—1(b) (2) and for Old-Age and Survivors Ins. Reg., 20 C.F.R. Sec. 404.1051(b). These are identical regulations which provide that for purposes of determining the existence of a trade or business, in regard to income included in "net earnings from self-employment" under Section 1402(a) (1) of the Internal Revenue Code and Section 211(a) (1) of the Social Security Act,

"The trade or business must be carried on by the individual, either personally or through agents or employees. * * * "

It is the contention of the plaintiff that, under Section 211(a) of the Social Security Act and Section 1402(a) of the Internal Revenue Code, the only income taxed as "net earnings from self-employment" or which may be counted as "net earnings from self-employment" for the purpose of achieving Social Security benefits is income derived from "carrying on" a trade or business. She urges that the 1956 amendments to the above Acts specifying that the income of certain farm landlords is not to be excluded from "net earnings from self-employment" are merely a recognition by Congress that such landlords are "carrying on" a trade or business. If so, plaintiff argues, the above regulations apply equally well to the trade or business of share-farming as to any other trade or business and while ordinarily personal activity would be involved it is not required.

Two administrative rulings by the Internal Revenue Service support the plaintiff's contention that while in theory self-employment income represents income from personal activity this has not been carried through to any logical end. In Rev.Rul. 58–267, 1958–1 CB 327, a man was committed to a mental institution and his wife took over the operation and management of his business. The husband was subsequently adjudicated of unsound mind and a guardian was appointed. The Internal Revenue Service ruled that the income derived by the incompetent from the business after his commitment and before his being adjudged insane, and also the income so derived after the adjudication of insanity qualified as "net earnings from self-employment" on his behalf under Section 1402(a) of the Internal Revenue Code. In Rev.Rul. 58–166, 1958–1 CB 324, an individual acquired a fractional interest in an oil and gas lease. He appointed the co-owner of the lease as his agent and delegated to him authority to manage and control the development of the operation. The taxpayer did little more than execute the original agreement and receive his share of the proceeds from the arrangement. The Internal Revenue Service ruled that the taxpayer's income from the lease in question constituted "net earnings from self-employment" under Section 1402(a). The latter ruling, however, turned upon the determination by the Service that the taxpayer was engaged in the operation as a joint venturer and the income in question was considered to be income from a trade or business carried on by a partnership of which he was a member, within that provision of Section 1402(a).

In the case of a partnership the theory that self-employment income must be derived from personal activity really breaks down. The distributive share of any partner, including limited partners, of the income derived from a trade or business carried on by the partnership of which he is a member, is considered to be self-employment income regardless of the degree of participation by such part-

mers. Treas.Reg. Sec. 1.1402(a)—1(b)(7) and Old-Age and Survivors Insurance Regs. 20 C.F.R. Sec. 404.1051(g).

The recent case of Henderson v. Flemming, 5 Cir., 1960, 283 F.2d 882, 887, involved an arrangement for vicarious participation in the management of production. In that case, the question was whether the claimant, the owner of land farmed by sharecroppers, could be considered as materially participating in the management of production on her farm when the supervision and direction relied upon to establish the material participation was carried on for the claimant by her son. There was no issue as to the degree of participation, for the Appeals Council of the Bureau made a finding that the farm was actively managed and operated for the claimant by her son and that he materially participated in the management of production on the farm. After so finding, the Appeals Council stated:

> "We believe, however, as found by the referee that a farmer cannot materially participate in the production of his crops without some personal activity."

The claimant's application was accordingly denied. The final decision of the Administrator was affirmed by the District Court, but, on appeal to the Court of Appeals for the Fifth Circuit, this determination was reversed. The Court of Appeals rejected the theory that personal activity is required, stating (at page 888 of 283 F.2d):

> " * * * this [the 1956 amendment] was a recognition that under some arrangements, the two, the owner of the land and the so-called tenant, are engaged in a joint venture. The result would be that the owner of land, as well as the tenant, would, in this way, be engaged in the business of farming.
>
> "Once that position is reached, there is nothing to distinguish it from other self-employment businesses. The person supplying the

capital—whether land, factory building, storeroom, cash, furniture and fixtures, inventory, or the like—may operate that business wholly through agents and employees with no more effort or supervision on his part than receiving and depositing the fruits of their labors. Consequently, the material participation is not confined to *personal* activities. It may be through agents or employees and quite without regard to the method of their compensation."

The case of Harper v. Flemming, D.C. 1960, 185 F.Supp. 14, was recently decided by the United States District Court for the Eastern District of North Carolina. In that case the claimant, an elderly widow, employed the trust department of a bank to manage her plantation for her in much the same manner as the plaintiff in the instant case employed a farm management company. In the Harper case there was no issue raised as to the requisite arrangement and it was not controverted that the acts performed by the bank in question in the operation of claimant's plantation through oral leases with sharecroppers would have constituted material participation in the management of production on the farm had the acts been performed directly by the claimant herself. The final decision of the defendant Secretary in that case was to deny the claimant's application for benefits solely upon the basis that the Act contemplates personal participation. In reviewing the administrative determination, the District Court held that the applicable regulations contemplated that for purposes of determining self-employment income a trade or business could be carried on either individually or through agents or employees and that the claimant had been engaged in carrying on the trade or business of sharecrop farming acting through her agent. The defendant Secretary was accordingly directed by the Court to allow the claim in that action. The decision of the District Court in Harper v. Flemming has been appealed to the Court of Appeals for the Fourth Circuit.

Because of another feature in the present case, it is not necessary for this Court to pass on the very close question of vicarious participation.

The wording of clause (A) of Section 211(a) (1) makes it clear that none of the activities which go toward constituting material participation may be counted for this purpose unless such participation is sufficiently provided for in an arrangement between landlord and tenant. Several pamphlets issued by the Social Security Administration and the Internal Revenue Service, and Rev.Rul. 57–58, 1957–1 CB 270, take the position that the arrangement may be either written or oral and that a mutual understanding between the landlord and tenant may constitute a sufficient arrangement. It was heretofore noted that this Court on the review of the decision of the Referee is limited to the record made before the Referee. The record made before the Referee as to the matter of arrangement for material participation on the part of the landlord consisted of the written lease between her and her tenants. It is her contention that the provisions of the lease meet the requirements of the Social Security Act as to the matter of arrangement. The defendant contends to the contrary.

There is some dispute between the plaintiff and the defendant concerning whether or not the arrangement must be couched in imperative or peremptory terms. The defendant apparently takes the position that the acts of a landlord going toward material participation are cognizable only if undertaken as the result of an express requirement therefor in the lease. Because most of the provisions of the lease here involved relate to the duties, obligations, and restrictions imposed upon the tenant, defendant urges that participation in the management of production is not expressly required of the plaintiff and therefore any efforts by her in this direction are voluntary and not cognizable under the Act. Plaintiff, on the other hand, maintains that the Act does not require a contract expressly requiring that the landlord perform acts constituting material participation. She urges that it is sufficient if provisions for landlord direction, approval, consent, etc., are expressed in terms of restrictions upon what the tenant may do in the absence of landlord approval.

It is the view of the Court that the term "arrangement," as used in the statute, was intended by Congress to be of broad scope; a view which is in accord with the interpretation which has been placed upon that provision in the interpretive bulletins and rulings issued by those charged with administering the Act. Rev.Rul. 57–58, 1957–1 CB 270, 271 states only that "the arrangement must clearly contemplate that the landowner will materially participate in the production or management of the production of such commodities." It would seem that one of the purposes of Congress in requiring an arrangement was to avoid the situation of a farm landowner qualifying for old-age insurance benefits by means of sua sponte activities or purposeless inspections and advice.

In the present case, as heretofore noted, the arrangement for material participation on the part of the landlord has to be found within the provisions of the lease between the plaintiff and her tenants. If the activities on her part which were provided for in that lease did not constitute material participation within the purview of the Social Security Act, then, of course, there would be no arrangement for material participation on her part within the purview of that Act.

In determining whether the provisions in the lease in question contemplate sufficient participation by the plaintiff under clause (A) of Section 211(a) (1), it becomes necessary, first, to determine the type and quantity of activity which must be performed by a farm landlord in order to constitute material participation on his part; and second, to determine if such activity is contemplated in the written lease between the plaintiff and her tenants. In support of her determination that the lease in question

did not provide for material participation on the part of the landlord, the Referee relied heavily upon the report of the Senate Finance Committee on the bill in question. That report (Senate Rep. No. 2133, 84th Cong., 2d Sess. (1956)) states at page 38 thereof (3 U.S.Code Cong.Service (1956) at pages 3884, 3915):

"Under both the committee-approved bill and the House bill, the present exclusion from self-employment earnings of rentals from real estate would not apply to income derived by an owner or tenant of a farm from its operation by another individual if there is material participation by the owner or tenant in the farm production under an arrangement which provides for such participation. * * *

"Under this amendment it is contemplated that the owner or tenant of land which is used in connection with the production of agricultural or horticultural commodities must participate to a material degree in the management decisions or physical work relating to such production in order for the income derived therefrom to be classified as 'net earnings from self-employment.' The committee is of the opinion that in any case in which the owner or tenant establishes the fact that he periodically advises or consults with such other individual as to the production of the commodities and also establishes the fact that he periodically inspects the production activities on the land he will have presented strong evidence of the existence of the degree of participation contemplated by the amendment. If the owner or tenant also establishes the fact that he furnishes a substantial portion of the machinery, implements, and livestock used in the production of the commodities or that he furnishes, or advances, or assumes financial responsibility for, a substantial part of the expense (other than labor expense) involved in the production of the commodities, the committee feels that he will have established the existence of the degree of participation contemplated by the amendment."

It is clear from the preceding that the Congress intended the coverage of the Act to be extended to those landowners who participated actively in the management of the farming operations as well as to those who engaged directly in the farming activities. This is further emphasized by the fact that the Senate amended the original House version of the bill by inserting the words "or the management of the production" after the word "production" in clause (A) of Section 211(a) (1) as set out supra. See Conference Rep. No. 2936, 84th Cong., 2d Sess. (1956) (3 U.S.Code Cong.Service (1956) at pages 3957–58) and statements by Senator Capehart, Volume 102 Cong.Record at page 13819. However, House Rep. No. 1189, 84th Cong., 1st Sess. (1955), which accompanied the original bill, also contemplated that participation in management decisions might be sufficient to qualify if done to a "material" degree. In that report it is stated at page 32 thereof:

"Under this amendment it is contemplated that the owner or tenant of land which is used in connection with the production of agricultural or horticultural commodities must participate to a material degree in the management decisions or physical work relating to such activities in order for the income derived therefrom to be classified as 'net earnings from self-employment.' "

That report goes on to state:

" * * * the mere furnishing of tools, equipment, supplies, and animals, or the mere selection of crops or livestock to be produced, would not, in and of itself, evidence the degree of participation contemplated by the amendment."

In Rev.Rul. 57–58, 1957–1 CB 270, the Internal Revenue Service has outlined

certain guides for determining when income derived by an owner of land under a share-farming or other rental arrangement with another individual should be considered in computing net earnings from self-employment. That ruling provides, in part, as follows (pp. 271–72):

"If the landowner, pursuant to the arrangement, participates to a material degree in the production of a commodity through physical work or management decisions, or a combination of both, the income derived by him under the arrangement is includable in computing net earnings from self-employment. However, no hard and fast rules can be laid down for determining in all cases the physical work and/or management decisions needed to establish the degree of participation contemplated by the statute. Also, while physical work and management decisions are the principal factors to be considered, the furnishing by the landowner of machinery, implements and livestock used in the production activities, or the furnishing or advancing of funds or the assuming of financial responsibility for expenses involved in the production of a commodity are additional factors which may be considered in arriving at a decision in a borderline case.

"It is evident from the foregoing that, as a general rule, each case must be decided upon its own facts and circumstances. It may be stated, however, that a landowner, who establishes that he (1) periodically advises or consults with the other party regarding the production of the commodity, (2) periodically inspects the production activities on the land, and (3) furnishes a substantial portion of the machinery, implements and livestock used in the production activities, or furnishes or advances funds or assumes financial responsibility for a substantial portion of the expense involved in the production of the commodity, should include the income derived by him under the arrangement in computing net earnings from self-employment."

IRS Publication No. 363 (which is identical in content with Social Security Administration Publication OASI—33a) is the most complete guide issued to date in the area of "material participation" by those charged with administering the Act. That publication states that the following factors are to be taken into account by the landowner in deciding whether he is materially participating so that his farm rental income counts for Social Security purposes:

"(a) How much work you do in or in connection with the production of the farm commodities.

"(b) What part you play in making management decisions and their importance to the success of the enterprise.

"(c) How often you advise and consult with your tenant about the production activities.

"(d) How regularly and frequently you inspect the production activities.

"(e) How much farm equipment, tools, and livestock you furnish which are used in producing the farm commodities.

"(f) How much of the production expenses you advance, pay, or stand good for."

The publication emphasizes that:

"These things count, however, only if under your arrangement with your tenant there is an understanding that you will do them. Activities which are purely voluntary on your part do not count."

These six factors, viz., physical labor on the part of the landlord, participation by the landlord in significant management decisions, periodic consultation and advice between landlord and tenant, periodic inspection by the landlord of production activities, the furnishing of a substantial portion of equipment, livestock, and machinery by the landlord,

and assumption of financial responsibility by the landlord for a substantial portion of the production expense are considered merely as indications of material participation by the Social Security Administration and Internal Revenue Service in the above publication. No one factor is said to be controlling, nor is it indicated that the absence of any one of these factors will preclude a landlord from establishing material participation. Those administering the program feel that the factors outlined in (c), (d), (e), or (f) will not, if taken individually, establish the degree of participation required. A combination of these factors is necessary. Regular and frequent management decisions contemplated in (b) above which significantly affect or contribute to the success of the farming operations are, however, considered in and of themselves to be a strong indication of material participation. It is indicated in the publication that management decisions, as well as inspection and advice, must be of a recurring or periodic nature to be counted and must significantly affect the success of the farming operation.

IRS Publication No. 363 and OASI—33d set forth four tests for determining material participation, together with examples in applying each test. The tests are summarized as follows:

"*Test No. 1*

"Do any three of the following:

"Advance, pay or stand good for at least half the direct costs of producing the crop.

"Furnish at least half the tools, equipment, and livestock used in producing the crop.

"Advise and consult with the tenant periodically.

"Inspect the production activities periodically."

"*Test No. 2*

"Regularly and frequently make or take an important part in making management decisions substantially contributing to or affecting the success of the enterprise."

"*Test No. 3*

"Work 100 hours or more spread over a period of 5 weeks or more in activities connected with producing the crop."

"*Test No. 4*

"Do things which, considered in their total effect, show that he is materially and significantly involved in the production of the farm commodities."

The four tests just mentioned and the six factors previously discussed are similarly outlined in Social Security Administration Publications, OASI—25f, pp. 19–23 (1958) and OASI—135, pp. 146–49 (1960).

In discussing the making of decisions as a factor in establishing material participation, IRS Publication No. 363 and OASI—33d emphasize that merely working out the farm plan or the lease arrangement at the beginning of the season is not enough. OASI—25f, entitled Farm People and Social Security, expands upon this a bit more and states at pages 20–21:

" * * * a distinction should be made between management decisions and conditions or stipulations in the rental agreement which are often referred to as the 'farm plan.' A rental agreement, either written or oral, generally includes an understanding between the landlord and the tenant whereby certain conditions are prescribed such as crop rotation, types and amounts of crops to be planted, practices to prevent soil erosion, control of noxious weeds, etc. These are primarily a means of maintaining the fertility of the soil and protecting the landowner's investment. These factors are considered as a part of the farm plan rather than as management decisions made in connection with the production activities. On the other hand, where the landlord has a right, stated or implied in the rental agreement, to make decisions during the production period on matters which have a direct bearing on production

of the commodities grown on the farm, such decisions, when made, are management decisions. These decisions are usually made subsequent to execution of the lease or oral arrangement."

It has been pointed out that a number of patterns exist for the leasing of farms whereby the landlord and tenant share in various ways the elements of production which create a successful farming operation. Part of the difficulty in construing the term "material participation," as provided in Section 211(a)(1) of the Act, lies in the fact that nearly all of these patterns involve something more than a bare rental of farm real estate. It is the usual pattern for the farm landlord to place some capital each year in the farming operation itself in addition to his capital investment in the land and buildings. This is often done by sharing with the tenant the cost of at least part of the seed and the harvesting of the crop. In addition, the landlord ordinarily reserves the right to decide what crops should be planted and where, how much fertilizer should be employed, whether weeds should be sprayed, etc. Decisions of this general type are difficult to classify because their effect is of a dual nature. They serve to preserve the landlord's capital investment in his farm and at the same time have an effect upon the production operations being carried on upon the farm by the tenant. Similarly, decisions reserved for the landlord's determination in regard to the harvesting of the crop are of a dual nature. They affect the production operations on the farm but at the same time their immediate purpose is the reduction of the crop to cash income for the landlord. It is thus not surprising that many farm landlords attempt to qualify for old-age benefits on the basis that the income derived from their farms involves more than a bare rental.

Because nearly all farm share-rental arrangements in this area do involve more than a bare rental of real estate, the decisive question to be determined is whether the 1956 amendments to the Act were intended by Congress to encompass most of these situations or only those which involve a substantial degree of landlord participation going considerably beyond the normal amount. The standards set forth by the Social Security Administration clearly require far more than the usual amount of the landlord participation in farm production. It is well settled that the interpretation placed upon a statute by an administrative agency entrusted with responsibility in a particular field by Congress is entitled to great weight. Social Security Board v. Nierotko, 1946, 327 U.S. 358, 368, 66 S.Ct. 637, 90 L.Ed. 718; Interstate Commerce Comm. v. Allen E. Kroblin, Inc., D.C.N.D.Iowa 1953, 113 F.Supp. 599, 623. The administrators may have been active in the drafting of the statute and, in addition, judicial decisions often lag sufficiently behind administrative practice that substantial reliance has been built upon administrative interpretation. However, in the present case, it is not necessary for this Court to pass upon the propriety of all the administrative interpretations and standards referred to. It is the view of the Court that the Committee reports of both the Senate and the House on the amendments in question make it clear that the term "material" as used in such amendments connotes something substantial and beyond the normal participation of a farm landlord in the production activities on the farm.

In order to determine whether the plaintiff's lease arrangement with her tenants provides for sufficient participation on her part to meet the test of the amendments in question, it is necessary to consider the principal provisions of that lease which are as follows:

"In consideration of the leasing of the premises the Tenants agree, without expense to the Landlord, to furnish all necessary tools, machinery, equipment, livestock, crop seeds (including hybrid seed corn), and labor to operate and maintain the farm in a husbandlike manner and to put in such crops in such

manner as the Landlord may direct and to pay a cash rent and crop share rent as follows:

"Two-fifths share of all small grain grown on said premises during term hereof;

"One-half share of all corn grown on said premises during term hereof;

"Two-fifths share of all beans grown on said premises during term hereof;

"Cash rent of $6.50 per acre for all land not included in foregoing crop, which cash rent shall be due and payable at Cedar Rapids, Iowa, at threshing time but in no event later than December 1 of the year of said term. In computing the cash rental the farm shall be taken as 112.65 acres and from this shall be deducted the acreage in corn, small grain, and beans, and the cash rental above specified shall be paid on the remainder.

"If any installment of rent is not paid when due, the full amount of the rental specified becomes due and payable at once at the option of the Landlord.

The Tenants further agree:

"1. To clean and treat all small grain seed and inoculate all clover, alfalfa and soybean seed sown.

"2. To plant only seeds, including hybrid seed corn, approved by the Landlord.

"3. To clip all fields newly sown to clover and mow weeds in pasture when and if requested by the Landlord.

"4. To permit no hogs on grassland without ring in snout and to reseed any ground rooted up.

"5. To mow or spray the weeds along all fence rows each year and to cut or control weeds in cultivated crops.

"6. To keep the buildings and lots free and clean of trash and litter, to keep the house lawn mowed and the lots free of weeds, so as to present a neat appearance at all times.

"7. To cut no alfalfa after September first nor cut a second crop of clover at any time.

"8. To furnish the Landlord immediately after harvesting of all small grain and soybeans, a signed statement by the thresher showing the number of bushels or kind of grain or seed threshed or combined.

"9. To not burn, sell or remove any straw either bailed or loose from the premises for it is agreed all unused straw is the property of the Landlord.

"10. To haul out and spread on the arable lands or wherever Landlord may direct, all manure now on or hereafter accumulated on the premises.

"11. To plow no new seeding, meadow or permanent pasture without the Landlord's written consent.

"12. To pasture no meadows, cultivated fields or fields sown to legumes without the Landlord's written consent.

"13. To comply fully with the regulations of the Department of Agriculture if so directed by the Landlord and to operate the farm in compliance therewith.

"14. To commit no waste or damage on the premises and to permit none to be done.

"15. To cut no live trees without written consent of the Landlord.

"16. To preserve and protect the fruit and ornamental trees, vines and shrubbery, that are now or may be hereafter planted upon the premises, from injury by plowing, or from cattle or other stock or rabbits.

"17. To protect and care for all buildings and improvements and to keep the same in such state of repair as they now are or may be

placed during the term hereof, reasonable wear or damage by accidental fire or windstorm only excepted.

"18. To use the premises for agricultural purposes only and to occupy the dwelling house and retain possession of said premises during the entire term of this lease and not to sublet any part thereof without the written consent of the Landlord.

"19. To furnish the labor for keeping the fences in condition without charge to the Landlord.

"20. To husk and crib the Landlord's share of corn.

"21. To shovel corn into sheller and deliver the Landlord's share of crops to the nearest railroad market point or any other equal distance when so directed by the Landlord. (Landlord to pay for shelling.)

"22. To reserve for the Landlord a proportionate share of cribs, bins or storage space available for the Landlord's share of all crops.

"23. To allow the Landlord, his agents or managers, or whomever the managers may engage, the right to enter the premises at any reasonable time to view the same or show them to prospective purchasers or to make repairs or improvements or to plow land on which a crop has been removed.

"24. To surrender the premises at the termination of their tenancy (including termination by cancellation) without further demand or notice in such condition as shall be in compliance with the provisions hereof."

In addition, the above lease agreement provided that the plaintiff was to furnish "all grass, clover and alfalfa seed to be sown on the premises."

Plaintiff relies upon the provision of the lease which states that the tenants agree to "maintain the farm in a husbandlike manner and to put in such crops in such manner as the Landlord may direct" and argues that this provision reserves the actual management of the farm to the owner rather than the tenants. In light of the previous discussion, it is the view of the Court that maintaining the farm in a husbandlike manner goes largely toward the preservation of plaintiff's capital investment. The agreement that the tenants will plant only such crops as the landlord may direct in the manner she may direct involves the making up of a farm plan as previously discussed; a non-recurring management decision used particularly to enable the plaintiff to maintain proper crop rotation on her acreage. Plaintiff urges that hers is the unusual lease with more than the ordinary management decisions reserved to her through the above clause. Such clause does not seem to be unusual but rather it would appear to be a rather common type of provision in a farm lease. See, as an example, Iowa State Bar Ass'n Official Form 14. Clauses 2, 3, 10, 11, 12, and 13 of the lease in question are also relied upon by the plaintiff as reserving substantial management decisions for her exercise. The provisions of the lease in question would seem to be substantially similar to the provisions of the so-called Eldridge Farm Lease which has been in long and common use in this state.

It is the view of the Court that the clauses in question, as well as the other provisions of the lease relied upon by the plaintiff, do not meet the requirements of material participation on the part of the landlord within the purview of the Social Security Act amendments in question. It would seem that if the provisions of the lease constitute an arrangement for material participation on the part of the landlord within the purview of the Social Security Act amendments in question, then for all practical purposes most of the farm landowners in this state who rent their farms under usual crop rent leases would be regarded as having made arrangements for their material participation within the purview of those amendments. It is the view of the Court

that such a result was not intended by Congress in enacting those amendments.

Some judicial support for the views expressed herein may be found in the rather recent cases of Conley v. Flemming, D.C.S.D.Cal., 190 F.Supp. 906; and Gregereson v. Flemming, No. 4–58 Civil 378, decided in May, 1959, by the United States District Court for the District of Minnesota. In the Conley case, the claimant lived in California and leased his South Dakota farm. The lease provided that the claimant was to direct what crops were to be planted and in which fields and was to direct which fields were to be fertilized. Claimant was to furnish two-thirds of the fertilizer and the tenant one-third. The tenant was to furnish all equipment and seed. Claimant went to his farm twice yearly, remaining one day at planting time and two weeks at harvest time. In affirming the decision of the Referee denying claimant's application for benefits, the Court stated [190 F.Supp. 907]:

> " * * * to hold plaintiff [claimant] entitled to old age benefits would be to extend Social Security coverage to investors in farming land, and not by virtue of their personal contributions of time and labor * * * but by virtue of their bargaining to obtain certain broad supervisory powers over those who as lessees actually engage in the production of commodities from the land."

In the Gregereson case, supra, the claimant was 78 years old. She had owned a farm in Montana since 1917 which her brother had farmed until 1955. Claimant, who had lived in Minneapolis, Minnesota, since 1933, then leased the farm to another individual. Under the lease the claimant made the final decisions as to the type and quantity of crops to be planted. She went to Montana each spring and purchased all of the seed, dealing personally with the feed dealers. She returned each fall and determined when to harvest the crop. Claimant was to pay for half the cost of combining and hauling the grain. The tenant furnished all machinery and labor. The Referee allowed the claimant's application but was reversed by the Appeals Council. The Appeals Council ruled that the claimant's visits to her farm merely reflected the normal self-interest of a landowner under a lease arrangement. The Court affirmed the Appeals Council without opinion. While the Conley and Gregereson cases involved a determination of the sufficiency of the activity which was carried on by the claimants rather than the sufficiency of the required arrangement, these cases are here in point in determining the meaning of the term "material participation."

The Court of Appeals for the Fifth Circuit in the case of Henderson v. Flemming, 1960, 283 F.2d 882, has also given consideration to the meaning of the term "material participation." That opinion contains certain language which is somewhat contrary to the administrative standards heretofore discussed. The facts of that case, however, were such that a strong showing of participation was made and the existence of the required arrangement was apparently not contested. The outcome turned upon the issue of vicarious participation previously discussed. The Court indicated by way of dictum that it felt the position of the Social Security Administration that a landlord cannot materially participate entirely through the furnishing of cash, credit, equipment, or supplies without additional participation of mind or body was an erroneous interpretation of the statute. The Court indicated that a substantial contribution of capital reasonably needed for production might, in and of itself, amount to material participation. As found by the Referee, the lease involved in the instant case does not contemplate a substantial contribution of capital by the plaintiff toward the farming operation. Such contribution on her part is limited under the lease to furnishing grass, clover, and alfalfa seed. For this reason, the dictum of the Court of Appeals for the Fifth Circuit has no application in the present action.

■ It is the holding of the Court that the finding of the Referee that there was no arrangement on the part of the landlord under the lease in question, within the purview of Section 211(a) (1) of the Social Security Act (42 U.S.C.A. § 411(a) (1)), is sustained by substantial evidence.

The matter of the contract between the plaintiff and the Midland Farm Management Company was heretofore referred to. The rights of that Company in relation to the farm in question could rise no higher than the rights of the plaintiff. Because of the holding by the Court sustaining the finding of the Referee that there was no arrangement for material participation on the part of the landlord under the lease, it is not necessary for the Court to pass upon the questions argued by the parties in connection with the farm management contract.

It is hereby ordered that the motion of the defendant for summary judgment be and the same is hereby sustained and the decision of the Secretary of Health, Education and Welfare be affirmed.