John H. BRIDIE, Plaintiff,

v.

Abraham A. RIBICOFF, Secretary of the
Department of Health, Education
and Welfare,* Defendant.

Civ. No. 1197.

United States District Court
N. D. Iowa, W. D.

June 20, 1961.

* On February 18, 1961, Abraham A. Ribi-
coff was substituted as defendant in lieu of Arthur S. Flemming, former Secre-
tary.

James L. McDonald, of McDonald, Sayre & McDonald, Cherokee, Iowa, for plaintiff.

F. E. Van Alstine, U. S. Dist. Atty., and Philip C. Lovrien, Asst. U. S. Dist. Atty., Sioux City, Iowa, for defendant.

GRAVEN, Chief Judge.

This is an action brought pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g), to review the final decision of the defendant Secretary of Health, Education and Welfare denying plaintiff's application for old-age benefits under Title II of that Act, as amended, 42 U.S.C.A. § 401 et seq. The defendant has answered and filed a certified copy of the transcript of the record made before the Secretary, including the evidence upon which the findings and decision complained of are based.

The plaintiff is the owner of a 203-acre farm near Cherokee, Iowa, which he has leased for the past several years on a so-called "50–50" crop-share and stock-share basis. In the federal income tax returns which the plaintiff filed with the Internal Revenue Service for 1956, 1957, and 1958, he listed the income which he received from the operation of his farm as self-employment income and paid the corresponding self-employment tax thereon. On March 31, 1959, the plaintiff, who was then seventy years of age, filed an application for old-age benefits on the basis of the self-employment income so reported. The Sioux City, Iowa, district office of the Bureau of Old-Age and Survivors Insurance informed the plaintiff by a letter dated May 2, 1959, that he was not entitled to old-age insurance benefits. The letter stated that plaintiff's reported quarters of coverage had been reduced to none because of the Bureau's determination that they were all based upon rentals from real estate, a type of income not includable as self-employment income under Section 211(a) (1) of the Social Security Act, 42 U.S.C.A. § 411(a) (1). On May 22, 1959, the plaintiff made a written request for a review of his application by a hearing examiner of the Social Security Administration as provided by the applicable regulations, 20 C.F.R. Sec. 403.709. Such a hearing was held on May 4, 1960, and the plaintiff was given an opportunity to present evidence in support of his application for benefits. Plaintiff was represented by counsel at that hearing. It was the determination of the hearing examiner that the district office had properly denied the plaintiff's application for benefits. The hearing examiner's reasons for so ruling were fully set forth in a written opinion and will presently be considered.

The plaintiff requested that the hearing examiner's decision be reviewed by the Appeals Council of the Social Security Administration. This request was denied, and the decision of the hearing examiner thus became the final decision of the Administrator under the provisions of Section 205(g) of the Act, 42 U.S.C.A. § 405(g), providing for judicial review. Cody v. Ribicoff, 8 Cir., 1961, 289 F.2d 394; Foster v. Flemming, D.C.1960, 190 F.Supp. 908, 911, and cases therein cited. The nature and scope of the review to be accorded such final decisions of the Administrator was fully discussed by this Court in the recent case of Foster v. Flemming, supra. It was therein stated in summation, that "[t]he function of this Court is to determine whether the factual findings of the Referee [hearing examiner] are supported by substantial evidence and, if so, whether he properly interpreted and applied the law to the facts." Id. at page 912. In so doing, the Court may consider only those matters presented before the hearing examiner.

The basic conditions for entitlement in the present case are not complicated. Section 214(a) of the Act requires that an individual have a minimum of six quarters of coverage in order to qualify for old-age benefits. The plaintiff had

reached retirement age before the coverage of the Act was enlarged so as to include the self-employed farmer and would qualify as soon as he attained the minimum six quarters. A quarter of coverage is achieved for each calendar quarter in which an individual is creditable with earning $100 or more in self-employment income. Upon the facts presented, the only source from which the plaintiff could attain six quarters of coverage is the income from his farm. The amount of such income ($1,200 for each of the three years) is apparently not questioned and is sufficient to give the plaintiff the requisite number of quarters if it qualifies as self-employment income.

Self-employment income is defined by Section 211(b) of the Act as "net earnings from self-employment derived by an individual * * * after 1950." "Net earnings from self-employment" are defined by Section 211(a) of the Act, as amended. The present controversy centers around an interpretation of the so-called "material participation" amendments to Section 211(a), which were enacted in 1956, 70 Stat. 824–825. That Section, as so amended, reads in part:

"* * * in computing [net earnings from self-employment] * * *

(1) There shall be excluded rentals from real estate and from personal property leased with real estate (including such rentals paid in crop shares), * * * except that the preceding provisions of this paragraph shall not apply to any income derived by the owner * * * if (A) such income is derived under an arrangement, between the owner * * * and another individual, which provides that such other individual shall produce agricultural * * * commodities * * * on such land, and that there shall be material participation by the owner * * * in the production or the management of the production of such * * * commodities, and (B) there is material participation

by the owner * * * with respect to any such * * * commodity."

It is the contention of the plaintiff that he was materially participating in the production and management of the production on his farm during the years of 1956, 1957, and 1958 and that, therefore, his share of the income from the farm for those years should have qualified as "net earnings from self-employment."

■ The legislative history of the concept of "material participation" was fully reviewed by this Court in the recent case of Foster v. Flemming, D.C. 1960, 190 F.Supp. 908. It need only be repeated here that the amendments were an apparent recognition by Congress that many farm landlords employ a method of "leasing" their farms whereby they share with the tenant the elements of production in ways often involving substantial personal contributions to the farming operation by the landlord. Because of this feature, Congress apparently felt that the income derived by a farm landlord who materially participates in the production or the management of the production on his farm could be more accurately classified as income derived from carrying on a trade or business rather than rent. As emphasized in Foster v. Flemming, supra, the activities of a farm landlord which count toward material participation under the Act are only cognizable if there is an arrangement existing between the landlord and the tenant providing for the requisite landlord participation. "Material participation" by farm landlords is discussed in an article by John C. O'Byrne, Farmers' Income Tax and Social Security— Current Developments, 7 Practical Lawyer 46, 72 (1961).

The denial of plaintiff's claim by the Sioux City district office of the Bureau was apparently based upon the answers given by the plaintiff to a "farm arrangement questionnaire" which he was required to submit along with his application for benefits, and upon the report of the field representative who had questioned the plaintiff concerning his ac-

tivities on the farm. These documents form a portion of the record made before the hearing examiner. In addition, testimony as to the plaintiff's activities in connection with the operation of his farm was given before the hearing examiner by the plaintiff, the plaintiff's tenant at the time of the hearing, and the brother of a former tenant. At the hearing, the hearing examiner received evidence and made findings relating to plaintiff's role in the operations on his farm during the years 1956 to 1959, inclusive. It is the view of the Court that the findings relating to 1959 are not material in determining plaintiff's eligibility for old-age benefits. However, because of the possible effect upon the tax owed, such findings will be reviewed along with those relating to the other three years.

The evidence, as outlined by the hearing examiner, shows that during the years in question the plaintiff had three different tenants: Erick Koeppen from March, 1953, until around March, 1958; Verle Allen from March, 1958, until around November, 1958; and John Husman from November, 1958, up until the time of the hearing. Plaintiff's farm contains two complete sets of buildings located nearly a mile apart. During this time, the plaintiff occupied the dwelling house adjacent to one of the sets of buildings and the tenants occupied the dwelling house adjacent to the other set of buildings. The hearing examiner adequately summarized the written farm lease in effect between the plaintiff and Erick Koeppen as follows:

"The farm lease * * * provides that the farm, except for one set of buildings and pasture of about 10 acres, would be leased to the tenant from March 1, 1953, and from year to year thereafter, unless proper notice of termination were given; that the tenant should furnish all machinery necessary to farm the premises; that the tenant might have chickens, limit 100 hens, and milk cows, limit two; that all other live stock was to be owned jointly, each furnishing half; that all grains raised or purchased should be owned in undivided interest; that each should pay one-half of the threshing, combining of soybeans, twine and bailing wire, corn shelling, seed (except the landlord to pay for grass seed and the tenant potato seed), veterinary expense for stock owned in undivided interest, trucking incident to farming operations (maximum liability of landlord $151.50); and 'That the tenant and the landlord shall cooperate together in the management of the farm work, in the planning of the cropping and in the sale of the grain and livestock; that in the event that livestock is purchased which will incur an expenditure by the landlord or by the tenant for one-half the purchase price, each reserves the right to say how much will be invested and the times of such purchases; that no feeding livestock shall be purchased by either landlord or tenant without the mutual consent of both; that the landlord will cooperate in the matter of marketing all products and livestock * * *.'"

The hearing examiner found that the written farm lease entered into between the plaintiff and Verle Allen was substantially identical with the Koeppen lease. Verle Allen was called into military service in November, 1958, and John Husman replaced him at that time and apparently operated under the same lease arrangement.

Plaintiff testified before the hearing examiner that although the lease arrangement for the years in question provided for joint ownership of livestock by the plaintiff and his tenants, he in fact advanced all the money to buy the feeder cattle or sows purchased and his tenants did not reimburse him for their share of the cost of these animals until they were marketed. Any new-born pigs were owned in undivided interests as was all grain purchased or raised. Almost all of the grain raised was fed to the stock. Plaintiff testified that his

arrangement with Verle Allen from March, 1958, until November, 1958, differed from the arrangement with his other tenants in that Allen was paid a salary for taking care of plaintiff's cattle and did not receive 50% of the proceeds when the cattle were sold. The plaintiff and Allen were operating 50–50 on the increase in the hogs, however. Plaintiff's testimony as to the nature of the 50–50 arrangement was corroborated by John Husman as to the year 1959 and by Lowell Allen, brother of Verle Allen, as to the arrangement his brother had with plaintiff during most of 1958.

In regard to his activities in connection with the farm management and the farm work, plaintiff testified substantially as follows: that the plaintiff and his tenant would go together and buy the livestock and decide between themselves which stock to buy and that they never had disagreed; that the feeding of the livestock was up to the tenant but that the tenant seldom made a feeding decision without consulting him and he merely suggested what he had fed in the past; that plaintiff personally contacted the feed dealers for the purchase of feed; that all of the cattle and some of the hogs were housed in the buildings near his house and about a mile from the tenant's house and that he looked them over daily; that he never made any suggestions to the tenant concerning the condition of the stock unless he detected that an animal was sick; that when a sick animal was detected, he and the tenant mutually decided on whether to call a veterinary; that veterinary expenses were shared equally; that the tenant made all the arrangements for vaccinating the hogs; that on several occasions plaintiff was left with the responsibility of watering the stock housed near him and regularly checked to see if they were watered; that the plaintiff and his tenant would mutually decide when the livestock was ready for market and the only disagreement as to this was once in 1959 when the plaintiff persuaded the tenant to wait a little longer to sell some hogs; that when livestock was sold the plaintiff would help the tenant load them and went along with them to market; that the tenants would discuss planting and harvesting of the crops with him but that it was left pretty much up to the tenant; that he checked for weeds and spoke to the tenant about spraying; that apart from the watering of livestock and loading them for market, his only physical work consisted of driving the tractor during haying when Koeppen was on the farm and in helping all of his tenants inoculate soybeans. Plaintiff testified that Allen and Husman were young men neither of whom had farmed alone before and that they came to him for advice more often than Koeppen had.

Lowell Allen testified that when his brother Verle was on plaintiff's farm, Verle would often consult with him about farming matters but would usually not make decisions without first consulting the plaintiff. John Husman testified that he and the plaintiff would go together to buy cattle after they discussed weights and prices and that since he was new at farming he left things up to the plaintiff. He stated that he had to ask the plaintiff what crops to put in and where in order to maintain the existing rotation plan.

Almost all of the testimony heretofore referred to was discussed in the written opinion and findings of the hearing examiner. In analyzing that ruling, it does not appear that the examiner chose to disbelieve any of the testimony but rather that her ruling went entirely to its legal sufficiency. Although the hearing examiner speaks of inconsistencies between the plaintiff's answers to the "farm arrangement questionnaire" and his testimony at the hearing, the testimony given would seem to be more a matter of supplementing the record with additional information which is not in fact inconsistent with former answers. The only real inconsistency which appears relates to plaintiff's role in inspecting for weeds and is very minor.

In ruling that the plaintiff could not be deemed to be materially participat-

ing in the management of the production on his farm, the hearing examiner stated:

"The evidence presented indicates that no decision affecting the management of production was made solely by the claimant [plaintiff] (or by the tenant) in 1958 or in 1959 and it appears that most such decisions were made by the tenant in 1956 and 1957. \* \* \*"

The lack of management decisions made by the plaintiff alone and to the exclusion of his tenants was a major ground advanced by the hearing examiner in denying plaintiff's claim. It is the view of the Court that the hearing examiner erred in requiring that management decisions must be made solely by the landlord in order to count toward material participation. If such were the case, no landlord under a lease of the type involved in this case could qualify since such a lease provides for joint management decisions as a natural counterpart to the joint venture type of farm operation which it sets up. It would seem not to be warranted to expect full landlord control as to the management of crops and livestock owned in undivided interests. There is no reason to assume that plaintiff's role in the decision making was not significant. This is particularly true during the two years in question when the inexperienced tenants were on his farm. Also, there is no evidence that he did not share in certain management decisions during 1956 and 1957 as provided in the lease. On the contrary, there is substantial evidence that he did.

This Court, in the case of Foster v. Flemming, D.C.1960, 190 F.Supp. 908, 926–27, discussed some of the tests which have been advanced by the Bureau of Old-Age and Survivors Insurance and the Internal Revenue Service for determining the existence of material participation. Rather than issuing formal regulations, these agencies have distributed a series of pamphlets outlining certain guides. Although the hearing examiner does not refer to these publications, it is apparent from comparing them with her opinion that they served as the guide in determining the applicable standards. These tests are phrased in terms of regularly and frequently making important management decisions (which alone may be enough); and advice and consultation with the tenant, periodic inspection of production activities, and advancing at least half the direct cost of production (which if combined may be enough). In applying the Bureau's standards, the hearing examiner was of the view that the plaintiff did not qualify. In addition to her determination that management decisions must be made independently in order to qualify, the hearing examiner found that although the plaintiff lived within 100 yards of the cattle and looked them over daily this did not constitute periodic inspection because he seldom found anything wrong with them to report to the tenant and he seldom inspected the crops. In fact, in connection with the whole matter of consultation and advice, plaintiff's activities were discredited because there was seldom any disagreement with his tenant. It would seem that such a standard would penalize a landlord for having an efficient and agreeable tenant.

The tests involving decisions, inspections, and advice set up by the Social Security Administration for determining the existence of material participation are not ends in themselves and only serve as guides in determining whether the income of a farm landlord should properly be classified as rent or as income from carrying on a business. It is difficult to see how the plaintiff's share of the farm income for the years in question can be categorized as rent under any standard. The entire lease agreement is descriptive of a joint venture type of business operation, how it is to be run, and how the profits are to be shared. There is no reference of any sort to the payment of rent under the lease. Although labels are not controlling, it is difficult to see how the division of profits set off to the plaintiff in the present case may be

likened to rent rather than self-employment income.

In summing up the extent of the plaintiff's activities in connection with the farming operation, the hearing examiner stated:

"In general, the claimant's [plaintiff's] primary concern was in his property and his investment, rather than in production or production activities."

It is the view of the Court that this statement is not supported by substantial evidence. The hearing examiner failed to recognize that plaintiff's property and investment (for which he naturally had primary concern) amounted to a good deal more than the land and buildings on the farm. He had a substantial investment in the production operations being carried on upon the farm as well. All of the evidence shows an active participation in all major decisions affecting the livestock operations. Although there was admittedly less participation in the growing of crops, livestock was the principal cash commodity produced. Thus, plaintiff's decisions and advice played a role in whatever economic success was achieved.

The plaintiff cites the decision of the Fifth Circuit in the case of Henderson v. Flemming, 1960, 283 F.2d 882, for the proposition that the advancement of a substantial amount of capital reasonably needed for the farming operation by a landlord can amount to material participation in and of itself. Although the statement in question was perhaps not necessary to the decision of the case, the Court in the Henderson case did clearly state that this was so. The following language used has certain application to the instant case (at page 888):

"In the same approach, we know at least today that agriculture is or may be big business. It takes more than land and a willing hand. It takes working capital, frequently in considerable amounts. An owner of land who is required to (and does) furnish substantial amounts of cash, credit or supplies toward this mutual undertaking which are reasonably needed in the production of the agricultural commodity and from the success of which he must look for actual recoupment likewise makes a 'material participation.' One is hardly a mere landlord in the traditional sense if he must risk considerable funds in addition to the land in the success of the venture. And what he gets—or hopes to get— is more than rent. It is profit from the operation of a business. * * "

In so stating, the Court specifically disapproved Revenue Ruling 57–58, Cumulative Bulletin 57–1, p. 270, example (4), to the contrary. Although the share-farming arrangements employed in the South, such as the one involved in the Henderson case, differ greatly from farm leasing in Iowa, some of the principles involved would seem to be the same.

It is not necessary for this Court to decide whether the advancement of capital in and of itself can constitute material participation. There were other significant factors contributed by the plaintiff toward the production operations. The defendant in its brief states that the correct test to be applied is that set forth in Senate Report No. 2133, 84th Congress, 2d Session (1956), at page 38 (3 U.S.Code Cong.Service (1956), at page 3915). That report states in part:

"The committee is of the opinion that in any case in which the owner * * * establishes the fact that he periodically advises or consults with [the tenant] * * * as to the production of the commodities and also establishes the fact that he periodically inspects the production activities on the land he will have presented strong evidence of the * * * degree of participation contemplated by the amendment.

"If the owner * * * also establishes the fact that he furnishes a substantial portion of the machin-

ery, implements, and livestock used * * * or advances, or assumes financial responsibility for, a substantial part of the expense (other than labor expense) involved * * he will have established the existence of the degree of participation contemplated by the amendment."

Using only the tests advocated by the defendant, it appears that the plaintiff has established the degree of participation contemplated by Congress for each of the years 1956–1959, inclusive. The record abounds with examples of periodic advice and consultation, periodic inspection of livestock, assumption of a substantial part of the production expense, and the making of management decisions by the plaintiff.

In so holding, this Court does not reject any evidence credited by the hearing examiner. It is the view of the Court that the ultimate finding on the administrative level that the plaintiff was not "materially participating" in the management of production of agricultural commodities on the farm in question was induced by "[a] misconception of the controlling principles of law and by giving undue weight to fragments of the evidence viewed out of context." See Cody v. Ribicoff, 8 Cir., 1961, 289 F.2d 394, 398.

█ It is the finding and holding of the Court that the finding of the Secretary of Health, Education and Welfare that the plaintiff was not materially participating in the management of production of agricultural commodities on the farm in question was not supported by substantial evidence.

It is ordered that the decision of the Secretary of Health, Education and Welfare that the plaintiff was not entitled to old-age benefits under Title II of the Social Security Act be and the same is hereby reversed.

It is further ordered that this matter is remanded to the said Secretary with directions that the plaintiff be granted appropriate old-age benefits under Title II of the Social Security Act.