**Latha R. ALLISON, Plaintiff,**

**v.**

**Anthony J. CELEBREZZE, Secretary of Health, Education and Welfare of the United States of America, Defendant.**

**No. CA/4142.**

United States District Court
W. D. South Carolina,
Spartanburg Division.

Aug. 21, 1964.

---

James C. Creal, Hyatt & Creal, Spartanburg, S. C., for plaintiff.

John C. Williams, U. S. Atty., Robert O. DuPre, Asst. U. S. Atty., Greenville, S. C., for defendant.

WYCHE, District Judge.

This is an action by the plaintiff Latha R. Allison to review a final decision of the defendant Secretary, denying the plaintiff's application for a period of disability and disability benefits authorized by the Social Security Act, as amended, Title 42 U.S.C.A. § 416(i) (1) and § 423. Jurisdiction exists pursuant to Section 205(g) of the Social Security Act, Title 42 U.S.C.A. § 405(g).

Under the review provision, 42 U.S.C.A. § 405(g), I am limited to a determination as to whether the Secretary's findings are supported by substantial evidence.

In accordance with such determination I may, on the basis of the record, enter judgment affirming, modifying or reversing the Secretary's decision, with or without remanding the case for a rehearing. A hearing de novo may not be held on the record and I may not in considering the facts substitute my findings or inferences for those of the Hearing Examiner which are supported by substantial evidence.

"Substantial evidence" means enough to justify a refusal to direct a verdict when the conclusion sought to be drawn from it be one of fact for the jury. Dowling v. Ribicoff, 200 F.Supp. 543 (D.C.1961); Woolridge v. Celebrezze, 214 F.Supp. 686 (D.C.1963).

Plaintiff's application filed on November 3, 1960, for insurance benefits and to establish a period of disability, was denied by the Bureau of Old-Age and Survivors Insurance on January 4, 1961. A request for reconsideration was filed on March 6, 1961, and the prior denial was affirmed by letter dated March 28, 1961. On May 24, 1961, plaintiff requested a hearing on the disability issue before a Hearing Examiner and a hearing was held on November 14, 1961, at which hearing plaintiff was not represented by counsel. The Hearing Examiner also denied her application in a decision dated March 15, 1962. The plaintiff's request to have the Appeals Council review the decision was denied on July 5, 1962, and the decision of the Hearing Examiner became the final decision of the Secretary of Health, Education and Welfare, subject to review pursuant to Section 205(g) of the Social Security Act, Title 42 U.S.C.A. § 405(g).

This case was remanded on May 13, 1963, to the Secretary of Health, Education and Welfare for further administrative action. The Appeals Council vacated its denial of the plaintiff's request for review of the decision of the prior Hearing Examiner which was issued on March 15, 1962, and remanded the proceeding to a Hearing Examiner, and a supplemental hearing was held on September 6, 1963, at which hearing the plaintiff was represented by counsel. On October 12, 1963, the Hearing Examiner filed his recommended decision, holding that the plaintiff was not entitled to the establishment of a period of disability or to disability insurance benefits, which decision was adopted by the Appeals Council on March 18, 1964, as its decision.

The question to be decided is whether at the time plaintiff filed her application on November 3, 1960, and while the special earnings requirements were met, the plaintiff was under a disability in that she was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration and, if so, the beginning date of such disability.

Plaintiff met the applicable earnings requirements in the calendar quarter ending June 30, 1953, the alleged quarter of onset of disability. Plaintiff last met the special earnings requirements on December 31, 1955. Therefore, in order for the plaintiff to be entitled to disability insurance benefits or the establishment of a period of disability, she must prove that she was under a disability as defined in the Act beginning on or before December 31, 1955.

Mrs. Allison was born March 24, 1908. She quit school in the sixth grade at age twelve, and went to work in a mill as a spinner at age fourteen. She married on April 24, 1948, and has one child, a daughter, born in March, 1949. She first worked at Whitney Mills (now Pequot) in 1922, for approximately one year, when she moved; she then went to work at Inman Mills as a spinner in 1923, where she worked until October, 1950, when, according to the mill's records her employment was terminated because "Overstayed leave (sick)".

On February 3, 1950, while working at Inman Mills on the second shift she was climbing up on a spinning frame, looking for a brush; she had her foot about eighteen inches from the floor on a rail, reaching up and the piece of rail to which she was holding pulled off and she fell backwards and twisted her back and hurt her leg. She landed in a sitting position on the floor.

She reported the accident to the mill and went home and called her family doctor who came to see her that night. She had a large ruptured vein on her right leg which on the ninth day after the accident had to be lanced. She could not move her leg but did not realize that she had hurt her back and did not complain to the doctor that night about her back. Her back started hurting her the next day. She returned to work on March 6th and worked the 6th and 7th and had to leave work on the night of the 7th because of her back. She returned to work on April 9th and worked from April 9th to July 14th, and then was off until October 8, 1950, which is the last she worked at Inman Mills.

She later worked at Martel Mills from August 10, 1952, until November 16, 1952, and had to quit on account of her back trouble.

On February 10, 1953, she went to work for Indian Head Mills and worked there until May 22, 1953, and according to her testimony she had to quit on account of her back trouble.

She testified that she was trying to work in spite of the pain she was suffering with her back and that after resting for a while her back would get better and she would try again to return to work.

Before she quit work in 1953, plaintiff's mother-in-law lived with her for about two years in order to help with the housework and with the little girl. Plaintiff is unable to do any heavy housework. Her husband and daughter do the heavy housework.

She enjoys sewing but has not been able to sew, except by hand, since her accident. She likes to read and watch television. She is not able to go to Church.

She has difficulty going up and down steps. She can walk on level ground if she turns her right foot out and braces herself. She uses a cane to help balance herself. She can only walk the length of a room—if she walks farther she says she is completely exhausted and has to sit down. She says her legs are weak and wobbly.

She sleeps on a traction board. She wore an orthopedic corset for two years but she says that it did not make her more comfortable and she has discontinued wearing it. She says that the pain in her back is constant and is just like the toothache; that she is unable to take narcotics, that even aspirin makes her heart flutter; she has to lie down at frequent intervals in order to ease her pain and that she cannot stand or sit any length of time; that she also suffers much discomfort from burning feet.

Plaintiff's husband says that his wife has suffered pain since she was hurt in 1950, and that her condition has grown progressively worse; that his wife cannot sit or stand very long at a time; that she has been unable to work since 1953, that she really was not able to work before that; that he and his daughter do the housework; that he works in the mill and is paying for the house in which they live.

Two of plaintiff's neighbors testified that they had observed Mrs. Allison and the difficulty she experiences in walking, sitting and balancing herself; that plaintiff's husband and daughter do the housework; that Mrs. Allison's condition has gradually grown worse; and that since prior to 1955, she has been completely unable to work.

Dr. S. J. Morrow, the first doctor who saw Mrs. Allison after she fell, is now deceased, and most of his records are not available. However, he made "Antero-posterior and lateral Films" on March 4, 1950, of the plaintiff which revealed "a mild scoliosis of the lumbar spine". These films were read by Dr. Rupert E. Hodges, Radiologist, on May 1, 1961, at the request of Dr. Walter Hastings and Dr. Charles Hanna.

Drs. Phifer and Way have been seeing Mrs. Allison since September, 1946, for intermittent urinary tract infection and urethral fibrosis, and in a statement of Dr. Phifer dated February 16, 1950, to Dr. Sam J. Morrow, he says: "Cystoscopically: No evidence of bladder calculus. There was marked infection of trigons and scattered throughout bladder and within urethra. Urinalysis: disclosed 15–20 wbc and clumps of wbc and motile bacilli." And he noted on subsequent visits and findings: "3/14/50 Backache ever since hurt leg. * * * 3/16/50—Back still hurting! Unable to do housework. This pain began in back while out with injured leg, * * *."

Mrs. Allison was sent to Dr. G. B. Hodge by Dr. Morrow and the insurance company for examination in connection with her Workmen's Compensation claim and Dr. Hodge in an undated report (Mrs. Allison testified that it was made in December, 1950) said: "This patient certainly presents a history of a ruptured intervertebral disc, however, on the basis of the examination, the findings characteristic of a disc are markedly lacking. She does have an exaggerated curvature of her lumbosacral spine, which undoubtedly must be causing her some symptoms as a result of instability. I would recommend that this patient have x-rays of the lumbosacral spine and a spinal myelogram in order to evaluate the complaint and findings." In a letter dated September 6, 1963, to the Hearing Examiner, Dr. Hodge said: "I saw the above named on November 1, 1950 complaining of pain in the back and right leg. This was a compensation case from Inman Mills and she alleged an injury. It was my opinion at that time that she might possibly have a herniated nucleus pulposus. She was hospitalized and x-rays and a myelogram were done which were entirely normal. * * * I could find no evidence of organic disease to account for her complaints and I felt that there was a great functional element in this patient's complaints. * * * "

Mrs. Allison says that the only treatment Dr. Morrow and Dr. Hodge recommended for her back complaints was rest.

Dr. J. E. DuPre, a chiropractor, saw Mrs. Allison in 1950, for a low back condition. He said that x-ray revealed sacro-iliac strain. Mrs. Allison testified that she continued going to Dr. DuPre for all of 1951.

Dr. R. G. Goins, chiropractor, first saw Mrs. Allison on December 15, 1952, and he says that she had "Severe curvature of lumbo-sacral spine" at that time and his diagnosis was: "Severe subluxation of lumbo-sacral spine" and can only do light work—no lifting. In a report dated November 18, 1960, his diagnosis is: "Malformation of lumbar-sacral spine with acute curvature of this region" and said that patient should do no lifting. In a letter dated November 7, 1961, to the Examiner, Dr. Goins says: "That a back injury has been a source of loss of work, support, plus mental anguish for

years. We treated her many times for this condition. First time in December 15, 1952. Prior to that time and after 1960 she has been treated by many others of other professions. It is our sincere opinion that she will never work as a wage earner again."

Mrs. Allison testified that she gets more relief from a chiropractic treatment than any medicine or other therapy and that she has been going to Dr. Goins off and on since 1952, and that when her back gets to hurting so badly that she cannot endure it any longer she goes to Dr. Goins for a treatment; that she averages one treatment a month.

Dr. James E. Allgood, Mrs. Allison's family doctor, in a report dated January 17, 1958, said that Mrs. Allison came to him on that date complaining of "Backache, pains in rt. leg if stands or walks. Rt. leg is weak & 'gives way' at times. Tenderness sacro-iliac joint. (Patient states that x-rays have already been sent in)." His diagnosis was, "Old injury of sacro-iliac joint with probably pressure on right sciatic nerve." He further stated that he had not theretofore treated her for this condition and that "This applicant was treated by Dr. S. J. Morrow, Deceased and by Dr. G. B. Hodge, Spartanburg, S. C. Her condition appears to be such that she is unable to pursue a gainful occupation."

On November 9, 1961, Dr. Allgood says: "This is to certify that I have treated Mrs. Latha Allison at intervals since Feb. 1948. During this period I treated her for minor conditions such as upset stomach, cystitis and for menopausal symptoms. I also treated her in 1948 & 1949 for pregnancy, she was delivered by cesaerean section in March 1949. Upon examination today she reveals marked weakness of the right leg and after sitting for a short time the legs become discolored apparently due to impairment of circulation. She states this is a result of a back injury received in Feb. 1950."

On May 10, 1962, Dr. Allgood examined Mrs. Allison and he states that his examination: "Shows an obese, short lady. Good range of motion in the head and neck. No Lymphadenopathy. Chest clear to percussion auscultation. Breast has no tenderness or masses. Abdomen little obese, no tenderness or masses. Good range of motion in the shoulders and arms. Good grip in both hands and arms. Reflexes equal and active, bilaterally. No atrophy of the calfs, Good strength in the calfs, leg lengths equal. Forward bends fairly good. Little tender over the sacro-iliac. X-ray: APL x-rays of the lumbo sacral spine show mild scoliosis convex to the left. Mild osteoarthritis, not too significant. Has some osteoporosis." And in a Medical Report dated May 10, 1962, Dr. Allgood says that Mrs. Allison "Has severe pain in the back and can walk with difficulty with a cane. Is gradually losing use of lower extremities." And his diagnosis is shown as follows: "1. Mild osteoarthritis, osteoporous, obesity. 2. Probable vascular insufficiency in lower extremities. Symptomatic & specific response poor." He says that she "grows worse" and that she is "unable to do any work".

In a Medical Report made by Dr. D. K. Stokes dated November 10, 1960, he states that he examined the plaintiff on that date for complaint of pain in right sacro-iliac joint and his diagnosis was "Possible chronic lumbo-sacral spasm and possible arthritic sacro-iliac * * *" and recommended that she should be examined by an orthopedist and have x-rays made and inspected by a radiologist.

Dr. Henry E. Plenge, radiologist, in a letter dated November 14, 1960, to Dr. Charles B. Hanna, says: X-ray examination of the lumbar and sacral segments of the spine reveals marked accentuation of the lumbo-sacral angle. No fracture or traumatic displacement of the visualized vertebrae is noted. No significant degree of arthritis is present. All of visualized bones show porosis.

And, Dr. Charles B. Hanna in his report dated November 14, 1960, says that Mrs. Allison's spine shows early arthritis. In a letter to the Social Security Administration dated May 1, 1961, says: "Mrs. Allison has again asked us to re-

view her case regarding pain in the lower back. * * *

" * * * Examination shows a well developed nourished woman of stated age, her blood pressure is 150/90, her spine has a normal lordotic curve. This is a point of soreness on the right sacro-iliac region. Pressure over this area causes no radiation. Her patella and achilles reflexes are normal. Babinski is normal. Each leg measures 12½″ in circumference at the calf and each leg is 32″ long from the anterior-superior spine of the ileum to the medial mallealus. There is no localized neurological changes. Straight leg raising is normal to 90 degrees on the left and causes some pain in the right sacro-iliac region at 85 degrees on the right.

"It is my impression that this lady is suffering from a mild arthritis of the sacro-iliac region."

Dr. Wendell H. Tiller, an Orthopedic Surgeon, in a report dated June 14, 1962, says he first saw Mrs. Allison on April 16, 1962, and last saw her on May 28, 1962. His diagnosis was: Mild osteoarthritis, osteoporosis, obesity, and that x-rays of the lumbosacral spine showed mild scoliosis convex to the left.

Mrs. Allison was admitted to the hospital on August 15, 1962, and remained until August 18, 1962, for examination by Dr. Frank F. Espey, a Neurologist of Greenville, South Carolina. His final diagnosis was: "Myelopathy of undetermined etiology, probably secondary to compression from enfolding of the ligamentum flavum and minimal spondylosis."

In answer to the following question of the Hearing Examiner "A myelogram performed in November, 1950, showed the spine to be normal. Would you assume from this that the lesions you noticed in the spine in August, 1962, occurred after November, 1950?" Dr. Espey said: "No; the offending lesion, in my opinion, is primarily ligamentous rather than arthritic."

An operation was suggested by Dr. Espey but Mrs. Allison decided not to undergo surgery because the doctor told her that the operation would not correct her condition, but might only halt the progressive nature of the paralysis with no assurance that this would result and with the possibility that it might make her condition worse, and further, because of the tremendous economical burden involved.

In a letter dated September 20, 1963, addressed to the Hearing Examiner, Dr. Charles B. Hanna said: "This lady was seen twice by us the first visit being the 14th of November, 1960. She has complained of almost constant aching in her right leg. This pain was aggravated by activity. She stated that prior to our visit, she had worn a lumbosacral corset, she was found to have a right sacral lipoma with point tenderness. This area was injected with Kenalog and Novacaine and she was given diathermy. X-ray of the lumbar and sacral segments of the spine revealed marked accentuation of the lumbosacral angle. No fracture or traumatic displacement of the visualized vertebra was noted. No significant degree of arthritis was present. All of the visualized bones showed porosis.

"She was again seen May 1, 1961 and we are enclosing a copy of our letter relative to this examination."

■ The Social Security Act should be liberally construed in favor of those seeking its benefits. Carroll v. Social Security Board, 7 Cir., 128 F.2d 876, 881; Ray v. Social Security Board, D.C. Ala., 73 F.Supp. 58; Carqueville v. Folsom, D.C.Ill., 170 F.Supp. 777.

In the case of Harper v. Flemming, 4 Cir., 1961, 288 F.2d 61, 64, Chief Judge Sobeloff said: "The purpose, as reported by the Congressional Committees, is clearly to make the coverage of the program 'as nearly universal as practicable,' and 'to give the newly covered groups equitable treatment as compared with those brought in earlier.' The legislation had its origin in the observed frequency of the tragic sequence of old age, disability, loss of earning power, destitution and dependency on public or

private charity, but coverage has not been limited to cases actually presenting all these features in full scope. The concept of the statute is more inclusive, and the design is, by a comprehensive contributory insurance plan, to avert the personal hazards and the social problems which often, but happily not always, attend old age.

"There is no warrant for reading into the statute fine-spun limitations of which the legislative authority has given no intimation. Doubtless Congress could have narrowed the criteria for coverage in the manner suggested, but the coverage sections are not so expressed. If the 1956 Amendment is to be constructed to embody what seems to us a gratuitous assumption that is the function of Congress. Looking at what Congress has done, we do not think that it would have been willing to adopt the Secretary's suggestion if it had been advanced; at all events it has not done so. Even if the question were more doubtful than it appears to us, we should be in duty bound to give the Act a liberal construction. We would not be free to tailor the Act, even if we found the proposed restriction logically attractive. The conclusion we reach is in accord with the only pertinent decision called to our attention. Henderson v. Flemming, 5 Cir., 1960, 283 F.2d 882, and see Foster v. Flemming, D.C.N.D.Iowa 1960, 190 F. Supp. 908."

■ "Test of eligibility for disability freeze under Social Security Act must include consideration of claimant's background, experience, training, education, physical and mental capabilities, whether type of employment he has followed is open to him and absence of any indication of specific work which he can perform existing in general area where he lives." Butler v. Flemming, 5 Cir., 1961, 288 F.2d 591.

"The referee, no doubt, in defining 'disability,' placed upon the phrase 'any substantial gainful activity' an objective test, although he uses language to the contrary. But surely the test must be subjective—surely our ever-enlarging bureaucracy has not yet reached the stage of 'expertise' that it can depersonalize a person's illnesses. Subjectiveness must be the test, * * *." Aaron v. Fleming, D.C.Ala., 168 F.Supp. 291, 294, 295.

■ Each and every claimant under the Social Security Act is entitled to have his or her case considered in the light of the individual, particular facts and circumstances surrounding such a claim. The very wording of Section 223 of the Social Security Act, 42 U.S.C.A. § 423, makes the point most strongly that each case and each person must be considered individually. That section sets forth that "every individual" who meets the requirements and is under a disability shall be entitled to a disability insurance benefit. In the case of Dunn v. Folsom, D.C.Ark., 166 F.Supp. 44, 48, there appears a recognition of this construction in the following language: "But the act is concerned not with a standard man of ordinary and customary abilities, but with the particular person who may claim its benefits and the effect of the impairment upon that person, with whatever abilities or inabilities he has. * * * Thus, if a medically determinable physical impairment exists, the court should consider whether such impairment prevents the particular plaintiff from engaging in any substantial gainful activity for which he is qualified, and to that end may consider his education, training, and experience, as well as the nature and extent of the impairment itself."

■ The phrases "inability to perform any substantial gainful activity" and "total disability" are not synonymous. In the case of Aaron v. Fleming, D.C.Ala., 168 F.Supp. 291, Judge Rives, Judge of the Fifth Circuit, sitting in the District Court, said: "It is further apparent that the referee gave too strict an application to 'disability.' Even though the Act is worded in strong language and the Congressional history indicates a strict policy of application, to conclude in this case that the plaintiff is not 'disabled' within the meaning

of the Act would make 'disability' commensurate with 'helplessness', 'bed-ridden,' or 'at death's door.' No matter how infirm, or disabled, or sick a man is, if he still possesses some of his faculties and some degree of mobility, he is not in the strictest sense unable to perform 'any substantial gainful activity.' I do not interpret the Act to apply only to the totally helpless and bed-ridden nor to those at death's door."

In the case of Hall v. Flemming, 6 Cir., 1961, 289 F.2d 290, 291, the rule of construction is stated as follows: "However, in the determination of this appeal, the controlling questions are: (1) what can appellant do; and (2) what employment opportunities are there for a man who can do only what appellant can do?" See also, Kerner v. Flemming, 2 Cir., 283 F.2d 916, 921.

 The evidence shows that Mrs. Allison's subjective symptoms and complaints of pain in her lower back, weak and wobbly legs, have been constant and continuous since the date of her fall at Inman Mills on February 3, 1950, until the present time, and that her condition has grown progressively worse. Her husband and two of her close neighbors corroborate plaintiff's allegations of intense pain and inability to work.

The objective findings of the doctors vary as to the cause of her subjective complaints, but none contradicted the findings of the other doctors, and without exception they have each made objective findings which would support the subjective symptoms of plaintiff, the only difference of opinion being as to severity and nature of ailment. The objective medical findings clearly disclose a medically determinable impairment.

To say that Mrs. Allison, who suffers with pain in her back and legs so severe that she cannot remain standing or sitting for long and can walk only short periods of time, is not so disabled as to preclude her from performing gainful activity within the Social Security law, is completely unrealistic and to approve it would make a mockery of justice. See, Leath v. Flemming, D.C.Ala., 1960, 191 F.Supp. 577.

After a careful examination of the record in this case and the foregoing authorities, I am of the opinion that the final decision of the Secretary is not supported by substantial evidence and is clearly erroneous. On the contrary, the conclusion that plaintiff is unable to engage in any substantial gainful activity appears self-evident to me. Plaintiff in this case is the victim of a medically determinable impairment of serious and substantial proportions which can only be expected to be of long and indefinite duration. As a direct result of this impairment plaintiff has been unable since May 22, 1953, to follow her life-long employment in manual labor jobs in the cotton mill after being compelled to terminate same despite her willingness and desire to continue working. Plaintiff's physical impairment, when considered in connection with her individual circumstances of age, work experience, education, training and skill, serves to eliminate effectively, any reasonable possibility of suitable employment or employment for which plaintiff is qualified; she is unable to perform any substantial service with reasonable regularity in some competitive employment or self-employment.

Under the foregoing authorities, I must conclude that the findings of the referee as to the establishment of a period of disability and disability insurance benefits are not supported by substantial evidence on the record considered as a whole and under the authority for appeal given by 42 U.S.C.A. § 405(g) the conclusion of the Secretary that the claimant was not entitled to the period of disability and the disability insurance benefits was clearly erroneous, was incorrect, and must, therefore, be reversed.

It is, therefore, ordered, that the decision of the Secretary in this case be and the same is hereby reversed, with direction that judgment be entered for the plaintiff.