Frank T. COLLINS, Plaintiff,

v.

Elliott L. RICHARDSON, Secretary of Health, Education and Welfare, Defendant.

Civ. A. No. 71–440.

United States District Court, D. South Carolina, Greenville Division.

Dec. 10, 1971.

John Bolt Culbertson, Greenville, S. C., for plaintiff.

Charles Gambrell, Columbia, S. C., for defendant.

ORDER

BLATT, District Judge.

This is a suit by the plaintiff against the Secretary of Health, Education and Welfare under section 205(g) of the Social Security Act, 42 U.S.C. 405(g), to review a final decision of the Secretary denying the plaintiff's application for the establishment of a period of disability under section 216(i) of the Act, 42 U.S.C. 416(i), and for disability insurance benefits, as provided by section 223 of the Act, 42 U.S.C. 423.

The plaintiff filed an application for a period of disability and for disability insurance benefits on December 31, 1968, alleging that he became unable to work on December 20, 1968, at age 50. The application was denied initially and on reconsideration by the Bureau of Disability Insurance of the Social Security Administration, after the South Carolina State Agency, upon evaluation of the

evidence by physicians and disability examiners, had found that the plaintiff was not under a disability. Being dissatisfied with the Administration's decision, the plaintiff requested and was granted a hearing on his claim by a hearing examiner of the Social Security Administration, Bureau of Hearings and Appeals. The hearing examiner, before whom the plaintiff and a medical advisor appeared, considered the case *de novo*, and on February 4, 1970, found that the plaintiff was not under a disability. The hearing examiner's decision became the final decision of the Secretary of Health, Education and Welfare, when the Appeals Council approved the hearing examiner's decision on March 31, 1971.

Plaintiff was born September 11, 1918, is divorced and presently resides with his mother. He was discharged from military service at 30 per cent disability as a result of the removal of his right kidney. Although plaintiff is not a graduate of an accredited high school —he completed the ninth grade—he does possess a high school equivalence certificate. At the hearing he testified to a work history that in relevant summation is as follows: machine operator in textile plant, finishing and shipping department at a bleachery; truck driver; Greenville Police Department, from which he was retired as a result of back trouble in 1958; insurance salesman; bartender; gas station attendant; nightwatchman.

Plaintiff testified at great length about a series of unfortunate accidents and major operations, which in combination, caused him great pain, restricted his activities and rendered him totally disabled. Specifically, plaintiff attributes his disability to nerves, enlarged heart, plus the residual effects of shattered hip, back and leg from a 1960 motorcycle accident, removal of one kidney in 1941, and a serious back operation in 1957. Compounding this, evidence was adduced and the hearing examiner concluded that plaintiff was suffering from a passive aggressive personality disorder. Plaintiff testified he had difficulty walking on his feet for a long period of time, that he has extremely poor circulation in his legs, and that he has a nervous problem.

Plaintiff has been in and out of hospitals in the last 10 years. As alluded to above, he had a laminectomy on March 6, 1957, and was discharged from the hospital in June of that year. Following his motorcycle accident in 1960, he spent 4 months in a cast. He also spent 63 days in the Lenwood Veterans Hospital in Augusta, Georgia, in 1960, where extensive tests were run. In the autumn of 1964, he spent 28 days in the Veterans Hospital in Columbia where a hernioplasty was performed. He then spent virtually the entire month of December, 1965, in the Veterans Hospital at Oteen, North Carolina, where the diagnoses were of (1) hypertensive vascular disease, (2) obesity, (3) degeneration of the medial meniscus of the right knee, (4) acute respiratory infection. He returned to Oteen for 10 days in 1966, and was treated as a chronic alcoholic. Plaintiff has returned to Oteen frequently for outpatient treatment and testified that he was at the Oteen Hospital in September, 1969, for a period of several weeks because of hip, leg, and back trouble, and that as a result of that visit, he has been taking medication for high blood pressure. However, no report from Oteen on this visit has been submitted.

The Veterans Administration Regional Office in March, 1967, concluded that plaintiff was not suffering from arteriolar nephrosclerosis and that the remaining kidney was functioning properly. They did not, however, reduce his disability benefits. Plaintiff was thoroughly examined by Dr. Armistead, an internist, on May 27, 1969, who reported as follows:

"1. Hypertension of years duration, now at high levels but without significant organ damage involving retinas or heart. His peripheral circulation is good. His renal status is not yet defined. He has an abnormal urinary

sediment as at PH and albuminuria with a history of stones obstructing the UP junction. This could represent gouty nephropathy. B.U.N. is pending. Patient findings are also consistent with hypertensive renal injury in the remaining kidney area.

2. Obesity.

3. Personality disorder with multiple complaints, nervousness and a history of passive aggressive classification at the VA Hospital.

4. Old fractures of femur and tibia on right with no objective changes now suggesting nonunion or inflammatory change in the joint. Subjectively, there is much pain. Please refer to X-ray reports. My impression is that functional limitation due to the back operation and fractures in the right lower extremity is not great." (Trans. 124).

Plaintiff was informed while hospitalized at Oteen in 1965, that he was suffering from hypertension. As the hearing examiner pointed out, "prolonged hypertension can result in cerebral hemorrhage, cardiac insufficiency, or urema." (Trans. 13). The hearing examiner concluded, however, that this problem was, if not totally arrested, at least sufficiently checked so as not to constitute a disability. In arriving at this conclusion, the hearing examiner relied on the Lenwood Hospital report of 1960.

Finally, although there was some medical disagreement as to the type of personality disorder from which plaintiff suffered, the hearing examiner agreed with Dr. Armistead's and Dr. Galloway's (an outstanding psychiatrist who served as the medical advisor) diagnoses that it was a passive aggressive personality disorder. Therefore, the hearing examiner found that this disorder was an impairment but not a substantial and disabling one.

The hearing examiner rendered an adverse decision finding that:

"1. The claimant has had one kidney removed but appears to have normal function in the other.

2. He has high blood pressure which has responded to medication and would probably be helped by weight loss.

3. He has a personality disorder which is not substantially impairing him.

4. He has had a fracture of the femur and tibia on the right in about 1960 and a laminectomy to remove a transverse bulge in the nucleus pulposus at L4–L5 interspace on March 6, 1957, which do not cause great functional limitation.

5. Claimant can do work at certain filling stations, tend bar or do night watchman work, all of which he has done in the past.

6. The claimant was not under a 'disability,' as defined in the Act, as amended, at any time prior to the issuance of this decision." (Trans. 14).

This Court is not prepared at this time to determine whether there is substantial evidence in the record to support the Secretary's findings. The record in this case is incomplete in three respects: the selection of an unqualified medical advisor; failure to receive and consider a report of the Oteen hospitalization of 1969, alluded to by the plaintiff at the hearing; and failure to submit vocational information to an accredited vocational expert.

This Court is aware of the recent Supreme Court decision which sanctioned the Secretary's procedure of admitting medical reports into evidence and having a medical advisor comment upon these reports. Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L. Ed.2d 842 (1971). *See also,* Kyle v. Cohen, 449 F.2d 489 (4th Cir. 1971) and Seay v. Richardson, Civil Action No. 70–451 (D.S.C., 1971). That a medical advisor can be utilized in Social Security hearings is beyond cavil. His function is also well defined. As stated by the Supreme Court and reiterated by the Court of Appeals for the Fourth Circuit,

the role of the medical advisor is as follows:

"He is used primarily in complex cases for explanation of medical problems in terms understandable to the layman-examiner. He is a neutral adviser . . . We see nothing unconstitutional or improper in the medical advisor concept . . ." 402 U.S. at 408, 91 S.Ct. at 1431.

The language of *Perales* also indicates that the testimony of a medical advisor *may* constitute the requisite substantial evidence to support the finding of the Secretary. However, because the interpretation and construction of medical reports submitted by other doctors is a thorny proposition at best, it is incumbent upon the Secretary to be judicious in his selection of advisors.

"The role of the medical advisor as explained by *Perales* is to make the medical record intelligible to the hearing examiners. It is not to second guess the doctors who are responsible for plaintiff's welfare, thereby defeating her claim for Social Security benefits. Such second guessing is too easily done by a doctor who has not examined the claimant, may have incomplete information, and bears absolutely no responsibility for the health of the patient." Seay v. Richardson, *supra.*

This Court concurs wholeheartedly with the above language. "Disability benefits under the Social Security Act were designed as remedial legislation. It was presumed that the agency would look after the interest of the poor, the handicapped and the illiterate . . ." Zeno v. Secretary, 331 F. Supp. 1095, 1096 (D.Puerto Rico, 1970). This Court feels a strong duty to uphold the beneficient purposes for which Congress passed the disability features of the Social Security Act and believes that the Social Security Act itself should always be liberally construed in favor of those seeking its benefits. Davidson v. Gardner, 370 F.2d 803 (6th Cir.) and Allison v. Celebrezze, 238 F.Supp. 667 (D.S.C.). These compelling considera-

tions weigh heavily on the Court's mind when it considers these cases. The procedure of using medical advisors to comment on medical reports, while mandated by *Perales,* does not give the Secretary license to indiscriminately choose advisors. In the instant case, this Court questions the efficacy of choosing a psychiatrist to interpret and construe the medical reports submitted by internists and neurologists. The Court is cognizant of the fact that a psychiatrist possesses a medical degree but has chosen to specialize in one particular field. Within his field, Dr. Galloway's credentials are impeccable. However, this Court does question the wisdom of having one specialist interpret the findings of another specialist in a nonrelated area. While *Perales* sanctioned the use of medical reports and the practice of using medical advisors, it did so only after careful consideration of the effect of lack of opportunity to cross examine. Therefore, this Court feels that the pedagogic role to be played by a medical advisor can be best performed by one who is more closely involved in that specialty.

The difficulty encountered by one specialist when he delves into an alien specialty was alluded to by the Secretary's own medical advisor:

"Q. Doctor (question addressed to Dr. Galloway by plaintiff's attorney) . . . did you find whether Dr. Armistead stated he should wear a built-up shoe?

A. Dr. Armistead made no mention of that, no recommendation about a built-up shoe. He is a specialist in internal and he could recommend that sort of thing. This, however, is usually more within the province of an orthopedic surgeon or the family physician." (Trans. at 63, 64).

The decision of the hearing examiner, and the testimony of Dr. Galloway, were made without the benefit of the hospital report from Oteen of September, 1969. (Trans. at 60). Whether this report would make any difference,

the Court is unprepared to say. However, upon remand, in order to have a completed record, this report should be obtained and considered.

The most serious defect in the record in this case stems from the hearing examiner's reliance upon the conclusions of Dr. Galloway with respect to the availability of jobs that the plaintiff might be able to perform. If Dr. Galloway's qualifications to interpret an internist's opinions are suspect, as the Court has found, his qualifications to pass on the availability of jobs are nonexistent.

Dr. Galloway commented at length on plaintiff's abilities and inabilities with respect to prospective employment. He concluded that plaintiff could not return to his principal employ—police work—because of his personality disorder. (Trans. at 61). He concluded, however, that plaintiff could find other jobs where his range of limitations would not too severely handicap him. (Trans. at 62, 63). The medical advisor further testified that plaintiff could be a night watchman, so long as he didn't have to "walk more than 2 miles an hour over a distance of beyond a mile  :  .  . the usual night watchman job I'm familiar with and have done, this would be within—he would not be impaired." (Trans. at 58, 59). This Court submits that Dr. Galloway has gone without the ambit of his specialty and trespassed into that of a vocational expert when he made the above statement. He also testified that plaintiff could work in a gas station, so long as he didn't have to do any tire changing, or have to lift cases of oil too frequently, or deal with controversial situations. (Trans. at 59, 60, 61). The medical advisor opined in response to a hypothetical question that plaintiff could work in a small service station where there is no mechanical work or lube jobs performed, and no tires changed. The *hearing examiner*

allowed that such small stations don't change any tires "at least they told me they didn't." (Trans. at 59).

This Court is aware of the statutory amendments which have constricted the scope of the Court's review by obviating inquiries into the actual availability of jobs to a claimant in a geographic location. See, e. g. Gardner v. Earnest, 371 F.2d 606 (4th Cir., 1967). The amended statute now provides:

"an individual  .  .  . shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, *regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work .  .  .* '(W)ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. 423 (d) (2) (A). (Emphasis added).

Despite the limited scope of our inquiry, this Court is not convinced that proper testimony was adduced with regard to whether such work exists *anywhere*. This Court feels that a vocational expert is the proper party to testify as to the existence of the type of service stations assumed into being by the hearing examiner and the limited-walking night watchman jobs which the medical advisor fondly recalled.

This Court is engaged in a search for truth and justice and such a search cannot prosper in darkness. Therefore, in accordance with the above, this matter is remanded to the Secretary for further proceedings consonant with the contents of this Order.