**Farnetta O. WEBB, Plaintiff,**

**v.**

**Casper WEINBERGER, Secretary, Department of Health, Education and Welfare, Defendant.**

**No. 73 H 155.**

United States District Court, N. D. Indiana, Hammond Division.

Feb. 22, 1974.

David P. Matsey, Legal Aid Society of Gary, Inc., Gary, Ind., for plaintiff.

John R. Wilks, U. S. Atty., Hammond, Ind., for defendant.

## MEMORANDUM OPINION

SHARP, District Judge.

This action was brought by the plaintiff, Farnetta O. Webb, on June 14, 1973 for a review of the final decision of the defendant, Secretary of Health, Education and Welfare, under Section 205(g) of the Social Security Act, 42 United States Code Annotated, Section 405(g).

The plaintiff filed an application for disability benefits on June 29, 1971, wherein she claimed that she was unable to work, commencing April 5, 1971, at age 43, because of nerves and high blood pressure. Her application was initially denied on September 2, 1971. Her request for reconsideration was also denied on November 24, 1973. She then requested and was granted a hearing before an Administrative Law Judge of the Bureau of Hearings and Appeals, Social Security Administration. The hearing was held at Chicago, Illinois, on May 19, 1972. Testimony was taken from the claimant and one witness. The Hearing Examiner, now known as Administrative Law Judge, entered his findings and decision on May 22, 1972, that the claimant was not entitled to a period of disability or to disability insurance benefits. A request for a review by the Appeals Council was filed by the claimant on June 23, 1972, and the request was granted on October 2, 1972. The Appeals Council on April 16,

1973 in its findings and decision affirmed the decision of the Administrative Law Judge. That being the final administrative action, claimant then filed this action on June 14, 1973. This case is now considered on cross-motions for summary judgment.

The definition of disability is found in sections 216(i)(1) and 223(d)(1) of the Act, 42 U.S.C.A., sections 416(i)(1) and 423(d)(1). Disability means:

"the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. § 423(d)(1)(A).

In determining whether or not an individual is disabled the Secretary must consider his age, education, work experience and the severity of his physical or mental impairments. Section 223(d)(2)(A) of the Act, 42 U.S.C.A., section 423(d)(2)(A).

The plaintiff was born on August 22, 1928, and is married but she and her husband have separated. She testified that she resided at 324 West 26th Avenue, Gary, Indiana with her daughter and two grandchildren. She said her highest grade of education was the eighth grade and that she has never had any vocational training. She is five feet six inches tall and weighs two hundred and sixteen pounds.

She testified that her first job was sometime in the 1940's where she performed domestic work in a private home. Then for two or three years after she turned eighteen she worked in a laundry. After that she returned to doing domestic work in private homes until she moved from the South to Indiana in 1953. Her first job soon after arriving was assembling notebook covers and this job lasted three or four months. She then again spent some time as a domestic and then began working in a nursing home where she would both dress, feed and generally care for patients' needs. That job lasted about a year or two and then she went back to domestic work. She next worked four years as a maid in a hospital until about 1968. After a short illness with the mumps she started to work for the Welfare Department, her last job. Her title was "homemaker" and she would cook, wash, and do light housework for welfare recipients, many of whom were bedridden. This job lasted until March 5, 1971 when she started hemorrhaging and was hospitalized.

The claimant testified that she has not cooked a meal since March, 1971, nor does she wash her own dishes, mop, or iron. She said she walks very little and "gives out" when she tries. She further added that she needs assistance in dressing herself. Her nerves, she said, often prevent her from sleeping well. She watches very little television and frequently sits and reads her Bible. She claims to have vision difficulties when reading. She said she listens to the radio more than watching television because she could hear better than read.

She was hospitalized for several weeks in 1971 and underwent surgery. She continued under treatment and was hospitalized again several times for short periods. She also testified as to sharp chest and hip and leg pains. Maintained also were very sharp headaches, with medication being of little help. The claimant testified that she was being treated for epileptic seizures, which were occurring a couple of times a week. She said they apparently lasted about an hour in duration and she would remember nothing.

Her means of support since March 1971 have been general assistance and private donations. The record also indicates that she was found eligible for disability assistance from the local Welfare Department.

The witness, Georgia Suttles, testified that she had observed these seizures and that the claimant would completely black out and fall to the floor. She added that

she would fall down and shake and they would at times put cold compresses so they would not jerk out of position.

Numerous medical reports are contained in the record of evidence. She was admitted to Walker Memorial Hospital on April 22, 1971, where a hysterectomy was performed. The attending physician, Dr. Frederick Battle, a general surgeon, indicated that she suffered from anxiety, essential hypertension, and obesity. Blood pressure was 115/105. Significant laboratory reports were essentially normal. She was again hospitalized from June 16, 1971 to June 22, 1971 for an alleged drug overdose. Blood pressure was 170/120 and the physical examination revealed gross ataxia. Laboratory, X-ray and consultation findings were normal. Her condition improved and she was released. She was hospitalized again at Walters Memorial from September 3, 1971, until September 9, 1971 for evaluation and treatment of moderate to severe hypertension. Dr. Battle indicated she suffered from moderate anxiety and obesity and he doubted she was taking her medication. Her blood pressure was 190/150 and her weight was 207 pounds. There were also grade 2 changes in her fundi. Laboratory, x-ray and consultative findings were normal. She was released feeling fine with prognosis fair to good.

Dr. Bernardo Saavedra, a full time neurological specialist reported on January 14, 1972 that the claimant came to him upon referral from her family physician, Dr. Ross, with her main complaint being pain in the left side of the head, temporal regions and dizzy spells. She also claimed to have frequent blackouts. An electroencephalogram performed in October 8, 1971, showed Dysrhythmia, Grade II, maximized on the left temporal region, notably where the reported headaches occur. Dr. Saavedra's impression was that she had a convulsive disorder.

In a short statement dated January 17, 1972, Dr. Ross, her family physician, said the claimant had epilepsy with frequent seizures and only mild improvement upon medication.

Dr. Ross, her family physician, completed a report for the Lake County Department of Public Welfare where he concluded she did have a physical or mental impairment, disease or loss reasonably certain to continue throughout the lifetime of the plaintiff without significant improvement and which substantially impairs her ability to perform labor or services or to engage in a useful occupation. His major diagnosis was 1). idiopathic epilepsy, and 2). hypertensive cardiovascular disease. The prognosis was permanent, slowly progressive and moderate. Her blood pressure was 180/110 and she weighed 213 pounds. The examination revealed cardiac enlargement. He found that she had definite weakness and exaggerated reflexes in the left side. He also indicated that her bone joints and extremities were not normal. She was found to be limited in her normal activities with medication not improving her situation to date.

An electroencephalogram taken on October 13, 1971, by Dr. Hyman L. Cohen at Methodist hospital showed a general disturbance which is maximal from the left temporal region. The EEG diagnosis was Dysrhythmia, Grade II, generalized, maximal left temporal. Though Dr. Cohen said that the abnormalities were moderate and nonspecific, the possibility of an underlying disturbance should be considered.

Medical notes from Dr. Ross dated May 16, 1972 indicated blood pressure of 180/110 and that the claimant has poor vision and hypertension, chest pains, and nocturnal dyspnea.

Two additional reports were received into the record by the Appeals Council. Dr. Ross, in a report dated October 13, 1972, said the claimant was initially treated by him for poor vision hypertension, and fainting spells. She also had tennitis and deafness on the left side. Blood pressure was 180/130. He found rales in both lungs and suggested mild

congestive heart failure. An EKG revealed left ventricular hypertrophy and strain. An EEG was also abnormal. Her response to medication was minimal. She reported frequent monthly seizures. He found her significantly ill and presumed disabled for most work and suggested she reapply for disability assistance.

The other report was from Dr. Saavedra dated November 2, 1972 and again an automobile accident involving the claimant was mentioned. She appeared at his examination complaining of pain in various portions of her body. He found marked difficulty in walking. He thought she could easily have a cervical disc, and perhaps a lumbar disc. He found marked difficulty in her movements. His impression was that she had a convulsive disorder, probably related to her reported accident. There was no question, he said, that this pateint was markedly disabled and that she could perform no type of job in her present condition. He suggested a complete diagnostic work up. A brain scan dated November 3, 1972 was essentially normal.

A medical analysis prepared by Dr. Sydney I. Green, for the Appeals Council was also submitted for the record. He found the claimant's seizure disorder to be a manifestation of emotional factors, as well as her leg, arm and spine problems. He doubted that actual fallout spells occurred. Dr. Saavedra's findings in November, 1972 were not really acceptable in a patient who will not cooperate. He said the medical evidence shows no significant epileptic impairment or spinal disc conditions or hypertension. It was his opinion that the evidence was complete and no further consultative opinions were needed. He said she could perform light work activities and manage weights, to sit, walk, to drive, etc., with restrictions from working at unprotected heights and in the presence of moving machinery.

After the decision of the Administrative Law Judge, and in connection with the plaintiff's request for review, the Appeals Council apparently decided that additional evidence was needed and it requested and obtained the analysis of the evidence by Dr. Sydney I. Green, a special consultant to the Bureau of Hearings and Appeals. It also appears that Dr. Green's report formed a substantial basis for the Appeals Council's findings and decision against this plaintiff.

The use of so-called "medical examiners" in social security disability cases has been approved by the Supreme Court of the United States in Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1972). Speaking for the court in *Perales* Mr. Justice Blackmun said, with reference to such medical advisers, "he is used primarily in complex cases for examination of medical problems in terms understandable to the layman examiner. He is a neutral adviser". 91 S.Ct. at page 1431. The basic of the holding in *Perales*, at 402 U.S. 402, at 91 S.Ct. 1428, at 28 L.Ed.2d 853 is:

"We conclude that a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence may be received as evidence in a disability hearing and, despite its hearsay character and an absence of cross-examination, and despite the presence of opposing direct medical testimony and testimony by the claimant himself, may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant, when the claimant has not exercised his right to subpoena the reporting physician and thereby provide himself with the opportunity for cross-examination of the physician."

In order to properly understand *Perales* it is very important to consider its factual context. In it the medical examiners appeared at the evidentiary hearing before the Administrative Law Judge and were subject to cross-examination. It is highly doubtful that the

majority of the Supreme Court in *Perales* had in mind the submission of a written medical report at the Appeals Council level which is not subject to challenge or cross-examination by a plaintiff-claimant in a social security disability case. Also, the medical advisers in *Perales* actually examined the claimant there. In this case Dr. Green did not.

The proper role of such medical advisers was well and accurately stated in Collins v. Richardson, 334 F.Supp. 1333 (D.C.S.C.1971), in which the court stated:

> "It is not to second guess the doctors who are responsible for the plaintiff's welfare, thereby defeating her claim for social security benefits. Such second guessing is too easily done by a doctor who has not examined the complainant, may have incomplete information, and been absolutely not responsible for the health of the patient."

■ ■ To this court it is fundamentally unfair and not within the spirit and intent of the Social Security Act for the social security administration to use a consultive physician in a role other than that outlined by the Supreme Court in *Perales*. It is not for a medical adviser or a so-called outside expert to make the decision as to the existence of a claim disability but such function reposes in the Administrative Law Judge and Appeals Council. See Moncrief v. Gardner, 357 F.2d 651 (5th Cir. 1966). Such medical adviser is to teach or explain complex medical data to the layman examiner and not to supplant such examiner's role as a finder of fact.

This court also has serious reservations about the competency and usefulness of Dr. Green's report since he had not actually examined the plaintiff-claimant here. There is substantial post-*Perales* authority that consultive reports of non-examining medical advisers cannot constitute substantial evidence. See Browne v. Richardson, 468 F.2d 1003 (1st Cir. 1972). For pre-*Perales* consistent therewith see Mefford v. Gard-

ner, 383 F.2d 748 (6th Cir. 1967). The well and carefully reasoned opinion of Judge Coffin is highly relevant here. He said, in part:

> "Dr. Goodman is a medical adviser who never examined the plaintiff but merely reviewed the written medical evidence and filed a written report. The use of both written medical reports and medical advisers was challenged in Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The Supreme Court there first held that written reports by physicians who have examined the claimant are admissible and may also constitute substantial evidence supportive of an adverse finding, when the claimant has not exercised his right to subpoena the doctors. Id. at 402, 91 S.Ct. 1420. It then went on to discuss the use of medical advisers who testify at hearings and held:
>
>> 'We see nothing unconstitutional or improper in the medical adviser concept and in the presence of Dr. Leavitt in this administrative hearing.' Id. at 408, 91 S.Ct. at 1431.
>
> It is not at all clear whether the Court thereby also held that such an adviser's testimony could constitute substantial evidence. See Gunter v. Richardson, 335 F.Supp. 907 (W.D.Ark. 1972), and Collins v. Richardson, 334 F.Supp. 1333 (D.S.C.1971). But we need not resolve that problem here for we face a very different situation from Perales. Dr. Goodman here neither examined the claimant nor testified at the hearing. His report thus lacks the assurance of reliability that comes on the one hand from first-hand observation and professional examination or, on the other, from first-hand testimony subject to claimant's cross-examination. It is hearsay based on hearsay. Thus, although the report may be admissible in light of *Perales*, it cannot be the substantial evidence needed to support a finding."

It appears to this court that *Browne* is very consistent with the letter and the spirit of *Perales*. In *Perales* the doctors

in question had examined the claimant and the reports were based upon personal consultation and personal examination. In the language of the court the reports "[were] routine, standard and unbiased medical reports by physician specialists concerning a subject [*who*] *they had seen*". (my emphasis) 91 S.Ct. at page 1428.

■ The *Browne* decision is strong and persuasive support for not allowing the social security administration to base its decision on medical adviser physicians examining the claimant *in absentia.*

■ This court is also concerned with the fact that another governmental agency had determined that this claimant was disabled. It is fully recognized that the defendant Secretary is not bound by any determination of such other agency. See Collier v. Richardson, 344 F.Supp. 768 (D.C.W.Va.1972). In this case the plaintiff's last employer was the one who found her disabled and awarded her benefits. She was awarded benefits under a program of the State of Indiana for aid to the permanently and totally disabled. See 42 U.S.C.A. §§ 1351–1355 and IC 12–1–7–29 through 12–1–7–50, Ind.Ann.Stat., Sections 52–1251a through 52–1251v. To qualify under that program the individual must have:

> "(a) . . . a physical or mental impairment, disease or loss which is verifiable by a physician possessing an unlimited license to practice medicine in this state and which appears reasonably certain to continue throughout the lifetime of the individual without significant improvement, and which substantially impairs his ability to perform labor or services or to engage in a useful occupation." *Supra,* IC 12–1–7–29, Ind.Ann.Stat., Section 52–1251a.

■ It is well established that once a disability claimant has established a prima facie case that he or she can no longer perform his or her former employment the burden of proof shifts to the defendant Secretary to present evidence that the claimant can engage in substantial and gainful employment and that such employment is available. See Kerner v. Flemming, 283 F.2d 916 (2d Cir. 1960), and Lamar v. Celebrezze, 354 F. 2d 645 (7th Cir. 1965). See also, 22 A. L.R.3rd 440 (1968).

Once the burden is thus shifted the defendant Secretary must introduce evidence of substantial gainful work that exists in the national economy for a person of the plaintiff-claimant's age, education and work experience and suffering from the same sort of physical impairment. See Meneses v. Secretary of Health, Education and Welfare, 143 U. S.App.D.C. 81, 442 F.2d 803 (1971).

■ Ability to engage in substantial gainful employment must actually exist—and cannot be merely theoretical. See Kerner v. Flemming, *supra*; Hammonds v. Celebrezze, 260 F.Supp. 992 (N.D.Ala.1965) and Hodgson v. Celebrezze, 357 F.2d 750 (3rd Cir. 1966). The mere theoretical ability to engage in substantial gainful activity is not enough if no reasonable opportunity therefor is available. See *Kerner, supra*, 283 F.2d at page 921.

■ It appears to this court that the claimant established a prima facie case that she could no longer perform her previous employment. It thus became incumbent upon the defendant Secretary to produce evidence that she could do other substantial, gainful employment and that such employment is available. This court has serious reservations about whether the Secretary sustained that burden, taking into account the plaintiff's age, education, work experience and physical impairments, and whether or not substantial gainful jobs that the claimant may perform are readily available in the national economy.

It is difficult to find any competent evidence in the record concerning any possible employment that this claimant-plaintiff might be able to perform. The only possible basis for the same is in Dr. Green's opinion that she could do light

work activities. The general incompetency of that opinion has already been discussed. Additionally, it would appear that Dr. Green's opinion is far from a finding that this plaintiff can perform certain substantial gainful activities and that those opportunities actually exist. This would be true even if Dr. Green's opinion was otherwise competent evidence. When it is realized that Dr. Green never saw this claimant and that the two physicians that did see her had contrary opinions, Dr. Green's opinion is more suspect and considerably more incompetent in the opinion of this court. Furthermore, a physician's opinion as to the available jobs a claimant could perform is highly suspect in itself if not incompetent. See Collins v. Richardson, 334 F.Supp. page 1337. It would appear that the area of expertise relating to available jobs is that of a vocational expert and not a medical expert.

The entire record in this case indicates to this court that the defendant Secretary in this case acted with less than proper impartiality, fairness or thoroughness. See Quinonez v. Richardson, 357 F.Supp. 420 (D.Puerto Rico 1973) and Sellars v. Secretary, Department of Health, Education and Welfare, 458 F.2d 984 (8th Cir. 1972). The plaintiff-claimant is entitled to a full and fair hearing. See Richardson v. Perales, 402 U.S. at page 410, 91 S.Ct. 1420.

■ This record discloses two substantial deficiencies. One is the consideration given to Dr. Green's written report with all of its attendant limitations and circumstances. The second is the failure of the government to sustain its burden of proof by competent evidence of the actual existence of job opportunities in the national economy with reference to this plaintiff.

This court does not concur with the suggestion made by counsel for the defendant Secretary that this decision can and should stand even if the opinion of Dr. Sydney I. Green is set aside. When one considers the rhetoric used by Dr. Green in comparison to the rhetoric used by the Appeals Council in its final decision one can only reasonably conclude that the latter relied on the former almost exclusively.

The Secretary cites Kyle v. Cohen, 449 F.2d 489 (4th Cir. 1971); Gunter v. Richardson, 335 F.Supp. 907 (D.C.W.D. Ark.1972) and Collins v. Richardson, *supra*.

In *Kyle* the medical experts who had not treated, examined or interviewed the claimant were permitted to testify *at the hearing before the hearing examiner*. Therefore, the claimant in *Kyle* had the opportunity to cross-examine the medical expert. This right to cross-examine is specifically mentioned and emphasized in Richardson v. Perales. This right to cross-examine was not in this case. The government also relies on Collins v. Richardson, *supra*. In *Collins* it also appears that the medical adviser in question appeared before the hearing examiner and would therefore have been subject to cross-examination by the claimant. Likewise, in *Gunter* the medical examiners in question appeared before the hearing examiner and therefore were subject to cross-examination.

To the extent that *Kyle, Gunter* and *Collins* purport to authorize the Appeals Council to consider the written testimony of a medical adviser who has not seen, treated or interviewed the claimant and who is not subject to cross-examination by the claimant, said cases, in the opinion of this court, misinterpret the letter and spirit of *Perales*. To the extent that *Kyle, Gunter* and *Collins* so hold this court would decline to follow them and believes that Browne v. Richardson is more in line with the letter and spirit of *Perales*.

For the above reason the court finds that the decision of the Secretary should be reversed and this case remanded to the Secretary. Upon remand the Secretary shall give this claimant an opportunity for a full evidentiary hearing before an Administrative Law Judge. If the defendant Secretary intends to rely upon the opinion of Dr. Green or any other similar medical adviser, before it

can do the same, said medical adviser must have personally examined the plaintiff and be subject to cross-examination in such evidentiary hearing. The plaintiff shall have an opportunity to present any and all additional evidence that is relevant to the issue of her disability as defined herein.